OTTO FERDINAND OLSSON et al., Appellants, v. REGINA PIERSON et al., Appellees.

OTTO FERDINAND OLSSON et al., Appellants, v. REGINA PIERSON, Appellee.

No. 46855.

DECEMBER 17, 1946.

Edson & Edson, of Storm Lake, and A. C. R. Swenson, of Omaha, for appellants.

Whitney, Whitney & Stern, of Storm Lake, for appellees.

SMITH, J.—Plaintiffs live in Sweden. Their brother, August Olson, lived approximately fifty-five years in this country and died in Buena Vista county, October 3, 1943, aged about seventy-five years. He never married, but lived, or made his head-quarters when not working, with various persons, first with the C. J. Blombergs, near Albert City. Mrs. Blomberg was his cousin and nearest of kin in this country.

Subsequently, when the Blombergs moved to town, he changed his headquarters to the farm home of Andrew Aronson, whose wife, Elsie, was a daughter of the Blombergs. During most of his life he worked as a farm hand and at his death he owned forty acres in Buena Vista county, seventy-five or eighty acres in Pocahontas county, and a personal estate worth approximately $5,000. About 1935, on account of ill health, he quit working regularly. and spent most of his time with the Aronsons; and when later, in 1938, they moved to another location he stayed on with their children who remained.

In 1940 he spent a short time in the Fort Dodge Lutheran Hospital. Shortly thereafter he went to the Swallum Hospital at Storm Lake, where he remained six or seven months. He then went to Axtell, Nebraska, to the Bethphage Institution, where he stayed from October 24, 1940, to January 7, 1941. From there he came back to the Andrew Aronson home.

On September 30, 1932, he made a will by which he gave all his property to his brothers in Sweden. He had visited them shortly before. In 1939 he made a new will giving everything to

Bethphage Inner Mission Association, Axtell, Nebraska. On May 3, 1940, he executed a broad power of attorney appointing his banker at Albert City to look after his property and business affairs.

The deed and bill of sale involved in this suit were executed January 25, 1941 (though dated January 24), at Storm Lake. On that day Andrew Aronson and Carl Anderson, an old friend and neighbor, took August Olson in to town pursuant to his own request. He told them he wanted to go in and have defendant, Regina Pierson, appointed his guardian. Miss Pierson was county recorder.

They arrived at her office in the courthouse around ten o'clock a. m. Upon being advised by them of the purpose of their visit Miss Pierson agreed to accept the appointment. She called Paul Turner, county attorney, who happened to be in the building, and he drew the necessary petition, which Mr. Olson signed, for her appointment.

The conveyances in question here were thereafter drawn in Turner's office about a block distant from the courthouse. Neither Miss Pierson nor Aronson nor Anderson was present or knew they were being drawn. The deed runs to both defendants and the bill of sale to defendant Pierson alone. The two separate suits for their cancellation were tried together and are consolidated for the purpose of this appeal. More particular reference to the testimony will be made as we proceed.

Plaintiffs allege fraud and undue influence and mental incompetence. The trial court found for defendants and rendered decree accordingly and plaintiffs have appealed.

I. Under the record the fraud, if any, was purely constructive, based entirely upon an assumed technical relation of guardian and ward between defendant Pierson and Olson. There is no evidence of any other kind of fraud or of any undue influence. There is no evidence of any solicitation by either defendant. Defendant Benna is Miss Pierson's aunt. Neither was related to Mr. Olson and there is no evidence that either knew of the execution of the instruments until after the transaction was completed.

It is questionable if any actual confidential relationship had

yet arisen and even whether the technical relation of guardian and ward had commenced. In fact, the record shows it had not.

The files of the guardianship case show the petition for appointment was not filed until three p. m. and letters of guardianship issued at four p. m. of the day the conveyances were executed. Under the undisputed testimony of plaintiffs' own two witnesses with whom Mr. Olson came to town that day they had all left town and returned to the Anderson home in the country several hours before that. It seems certain, then, that even technically the guardianship had not commenced when the conveyances were executed.

But even if the technical fact were otherwise, no real confidential relationship because of the appointment could have arisen. There had been no association between them as guardian and ward. No property had come into the guardian's hands and she had neither performed any act nor assumed any of the duties of the relationship. No position of dominance could have yet existed by reason of the appointment. The plan for giving his property to defendants could not have grown out of the existence of the relationship, for at best—or worst—it had not really begun.

It appears rather that the conveyances were the result of the same feeling of friendship and trust that prompted Mr. Olson to select Miss Pierson as his guardian. The transactions were apparently contemporaneous in his mind. That feeling, prompting both acts, did not grow out of any closeness of association or of any conduct that had created a confidential relationship in any legal or equitable sense. Whatever presumption might otherwise arise as to undue influence or constructive fraud is overcome by the facts.

Nor does the record bear out the contention that Mr. Olson, in making the conveyances, was without independent legal advice, if we were to assume the circumstances to have been such as to require proof of such advice as an equitable prerequisite to upholding the validity of the instruments. The attorney who drew the instruments did so at Olson's request. He was not attorney for Miss Pierson either individually or as guardian. He had represented Olson in drawing the petition for guardianship. Any shortcomings in the advice he gave should not be

charged to defendants. That he subsequently acted as attorney for the guardianship was a natural outcome but he was not acting in that capacity at the time he drew these conveyances.

Something is sought to be made of the fact that the instruments were predated one day. The attorney testified that this was done in view of the guardianship appointment on the 25th, "although I didn't know that that would make any difference since it was a voluntary guardianship. I thought the title might be best; I didn't want to take time to look it up."

We see nothing even suspicious in the circumstance nor in the fact that much later the attorney antedated a revocation of the 1939 will to January 24, 1941. Neither tends to establish fraud in the making of the deed and bill of sale.

The rule of constructive fraud as to transactions between persons in confidential relationship is a salutary one and should be jealously upheld. But the *relationship* should be clearly established before the rule is invoked against one who is the beneficiary of a transaction that is free from any appearance of actual fraud. Otherwise it might become a weapon to thwart the will of the very one whose interest it is designed to protect. There is here no slightest contention of fraud, actual or constructive, between decedent and Mrs. Benna. And as to Miss Pierson, the most that can be said is that she was given the property in consideration of the same friendship that prompted her selection as guardian and not because of the relationship, since that had not actually commenced.

II. The record is voluminous on the subject of Mr. Olson's mental condition. A large number of lay witnesses testified to facts upon which they based the opinion he was incompetent. Three expert witnesses expressed a similar opinion: one wholly upon the basis of hypothetical questions; the other two, in part at least, from personal observation.

The trial court in an analysis of the entire testimony points out that the opinions of those lay witnesses were based on the fact that decedent had various "persecution delusions." This testimony was also embodied in the hypothetical questions to the experts. Some of the lay witnesses who told of these delusions indicated that they came on by "spells"; that "he was better at

times than others"; sometimes his mind was "pretty good"; "at times his mind seemed good."

The delusions mostly were that his money was being stolen by his attorney in fact; that attempts were being made to poison him; that certain friends had been sent to the penitentiary; that his clothes had been stolen while he was at the hospital; that spirits came to the hospital and threw his things in the lake; and that people in the hospital were stripping flesh from skeletons in the operating room. There was also testimony that he talked at times of committing suicide.

The experts who expressed the opinion he was insane diagnosed his mental illness as "psychosis with cerebral arteriosclerosis" and "senile dementia." One said:

"At times he would be perfectly rational in my opinion and at other times I thought that his mind was not rational"; and, "I admit that this man was at times able to make rational decisions."

A number of lay witnesses testified to Mr. Olson's soundness of mind, based upon varying degrees of intimacy of association and opportunity for observing. Among them were two nurses who helped care for him during a five-months' stay in the hospital in 1940. One expert witness gave similar testimony based on hypothetical questions not materially different from those propounded to the other experts.

It is manifestly impossible to compress within reasonable limits the approximately five hundred pages of record, much of which is devoted to the inquiry into Mr. Olson's mental condition. More than thirty witnesses testified on the subject. Nor do we think it would be helpful to the profession to set out the testimony at great length.

The facts of the transaction itself, uncontradicted in substance, indicate a degree of intelligence at variance with any theory of mental incompetency. Decedent had no dependents. He asked to be taken to Storm Lake for the purpose of having Miss Pierson appointed his guardian. The application for the appointment itself did not import or raise any presumption of mental incompetence. It was done under section 670.5, Iowa Code, 1946 (section 12617, Code, 1939). He had known defendant

Pierson since she was a little girl, and presumably her aunt, defendant Benna, still longer, but it does not appear their association had been particularly intimate.

Turner testified that after the guardianship papers were drawn Olson told him he wanted papers drawn to give his (Olson's) farm to Miss Pierson and Edith Benna, her aunt.

Following this testimony a motion was made to strike it and objection urged to any further testimony on the subject, for the reason the witness was incompetent and the matter privileged because of the relationship of attorney and client. We shall refer to this contention later.

Mr. Olson told Turner he owned two farms, one forty acres, the other a little over seventy-five acres; that they were close to Albert City (Buena Vista county), one being over the line in Pocahontas county; that there were new buildings on the larger farm but none on the forty. Other testimony in the record shows the correctness of this information. After the suggestion of Turner that he accomplish his purpose by will was rejected by Olson the conveyances were drawn and placed in escrow in the hands of the attorney with a letter directing that the deed be delivered to grantees at grantor's death. The bill of sale was by its express terms made to take effect at Olson's death and covered all money on deposit in Albert City Savings Bank (balance on hand "upon my death"); also any and all personal property.

Turner also testified:

"I asked him when he wanted them to have this property, and he said when he died and that he wanted it until he died; so—then I asked him if he had ever been married, and he said, no, he hadn't; never had any children; and I asked him if he had any relatives in this country, close relatives, and he said he had cousins. I don't recall how many he said. I think I asked him but I don't recall; and I asked him if he had any other relatives anywhere and he said he had two brothers, I believe he said, in Sweden; and I asked him their names and he told me what they were—I don't recall myself right now what their names were."

There are other significant circumstances shown. In March 1941, following the making of the deed and bill of sale, Olson

went from Des Moines to Excelsior Springs, apparently alone. Shortly before the papers were drawn he traveled alone from Axtell, Nebraska, to Sioux City. In fact, he seemed to get around without unusual difficulty.

There is testimony of the daughter of the landlady with whom he lived in the last months of his life that he told of the making of the conveyances and said he wanted Miss Pierson and Mrs. Benna to have his property when he died.

On the basis of the evidence thus (inadequately perhaps) summarized it is contended the conveyances should be set aside because of mental incompetence of the grantor. We agree with the trial court in rejecting this contention. Mr. Olson had no one dependent upon him. His brothers (plaintiffs) lived in Sweden and long before this transaction he had revoked an earlier will in their favor and made one in which he gave everything to a charitable institution in Nebraska. There is nothing in the record to suggest this was the result of any unsoundness of mind.

Notwithstanding the strong showing as to delusions, it does not appear that they caused or influenced the execution of the conveyances or the formation of the plan the instruments invoked here were designed to carry out. It was said by this court, in a somewhat similar case, Bishop v. Leighty, Iowa, 237 N. W. 251, 257, 258:

"The evidence offered in behalf of plaintiff does show delusions. The delusions, however, have no reference to any of the parties to the controversy, or to their relationship, to claims upon decedent or to her property or to the nature and effect of the instrument which she was signing. Delusions of themselves are not proof of mental incompetency. Reese v. Shutte, 133 Iowa, 681, 108 N. W. 525; Mathews v. Nash, 151 Iowa, 125, 130 N. W. 796, and cases post."

See cases later cited in the opinion; also, see, Zinkula v. Zinkula, 171 Iowa 287, 305, 306, 154 N. W. 158; Flynn v. Moore, 181 Iowa 1163, 1169, 1170, 165 N. W. 351; 26 C. J. S. 265, section 54c.

Plaintiffs argue that the delusions shown here did "affect or relate to the subject of the contract or conveyance." We can-

not follow this reasoning. The facts do not support it. The "subject" was the disposition of his property. The delusions had no relation to his decision not to leave it to his brothers or his decision to give it to Miss Pierson and her aunt.

We are not unmindful of the contention that the delusions may have been symptoms of an underlying mental deterioration that might have rendered Mr. Olson wholly incompetent mentally. But the facts and circumstances shown in the record quite satisfactorily negative that possibility. The record shows that he knew the nature and substantially the extent of his property. It indicates he understood what he was doing and what the result of his act would be. Two years later (in 1943) he told Miss Bauer, a wholly disinterested witness, "that Regina and Edith were to have his property at the time of his death" and said "he wanted Regina Pierson and Edith Benna to have his property at the time of his death."

There are, of course, contradictions and conflicts in the record. The trial court had to weigh the testimony and determine the issue accordingly. It has done so fairly and intelligently. It saw and heard most of the witnesses and was in some respects in a better position than are we to appraise the situation. Its decision should be affirmed.

III. The trial court admitted the testimony of the attorney, Turner, on the theory he was only a scrivener in the transaction. The record indicates that he was something more. But, assuming that he acted as Olson's attorney, does it follow he is incompetent, or that plaintiffs may urge the objection as to his competency in this case, to testify to confidential communications? Of course, much of his testimony was not of that nature, but an important part of it was.

Our statute says:

"No practicing attorney, counselor, physician, surgeon, or the stenographer or confidential clerk of any such person, who obtains such information by reason of his employment * * * shall be allowed, in giving testimony, to disclose any confidential communication properly entrusted to him in his professional capacity, and necessary and proper to enable him to discharge the functions of his office * * * Such prohibition shall

not apply to cases where the party in whose favor the same is made waives the rights conferred.'' Section 622.10, Code, 1946 (section 11263, Code, 1939).

This court has inferentially held the statute, as applied to attorneys, does not change the common-law rule and merely extends the rule to apply to physicians. Winters v. Winters, 102 Iowa 53, 57 et seq., 71 N. W. 184, 185, 63 Am. St. Rep. 428. In that case it is said:

''Those [communications] to an attorney, however, were privileged [at common law], and it was held that the attorney might not divulge without the consent of the client while living, but that, after his death, in a contest between a stranger and an heir, devisee, or personal representative, the latter might waive the privilege and examine the attorney * * * though the stranger was not permitted to do so; and, in a controversy between heirs at law, devisees, and personal representatives, the claim * * * could not be urged, because, in such a case, the proceedings were not adverse to the estate, and the interest of the deceased, as well as of the estate, was, that the truth be ascertained.'' (Citing authorities.)

The testimony in the Winters case was that of a physician and was offered by decedent's widow as proponent in a will contest. Objection to the testimony was made by an heir, as contestant. Neither was a ''stranger'' within the meaning of the quotation. The opinion criticizes a California case (In re Flint's Estate, 100 Cal. 391, 34 P. 863) which held the privilege could not be waived by an heir in a will contest with a devisee, and says:

''And no one can be said to represent the deceased in that contest, for he could only be interested in having the truth ascertained, and his estate can only be protected by establishing or defeating the instrument as the truth so ascertained may require.'' 102 Iowa, at page 59, 71 N. W., page 185.

The case of Denning v. Butcher, 91 Iowa 425, 437, 59 N. W. 69, 73, was also a will contest. The testimony of decedent's physicians in favor of proponents was admitted over contest-

ant's objections. It was held the privilege could be waived "by those whose interest it is to maintain the integrity of the will."

In Boyles v. Cora, 232 Iowa 822, 6 N. W. 2d 401, the widow of a decedent sued to set aside a deed of her husband. It was held she could waive the privilege and avail herself of the testimony of her husband's physicians.

We have in the instant case also a suit to set aside conveyances made by decedent. The offered testimony here is in support of the instruments. In the deed grantor retained a life estate and the bill of sale was to take effect and be delivered to grantee at his death. Both were placed in escrow for delivery at his death. Those claiming under them seek to use the attorney's testimony to "maintain the integrity" of the instruments as against the attack of heirs.

The analogy between this case and a will contest is clear. Those tendering the testimony are claiming "under" decedent as truly as do devisees under a purported will offered for but not yet admitted to probate or as do heirs in such a case. They are not "strangers." In the case of the will contest, it was said:

"The statutes are for the benefit of the patient while living and of his estate when dead. The very purpose of the contest is to determine whether the deceased in fact made a will, who shall be his representative, and who is entitled to his estate. * * * The same presumptions are indulged in favor of the validity of the will as of other written instruments. The paramount purpose in the first instance should be to ascertain whether the instrument presented is in fact the will of the deceased. And no one can be said to represent the deceased in that contest * * *." Winters v. Winters, supra, at page 58 of 102 Iowa, page 185 of 71 N. W. (See remainder of quotation, ante.)

The exact question presented here seems to have been decided in other jurisdictions against the contention here that the testimony of the attorney was incompetent. Warner v. Kerr, 216 Mich. 139, 145, 184 N. W. 425, 427, involved the validity of a decedent's deed, attacked by his daughter. The Michigan court held admissible the testimony of the attorney who drew it, saying:

"Neither party to the litigation was a stranger to the estate. Both parties were claiming under the client."

In Boyd v. Kilmer, 285 Pa. 533, 539, 132 A. 709, 711, a similar situation was presented. The court said:

"An attorney may testify in favor of his client [citing cases], and as the testimony of the attorney was in support of the deed executed by his client, it was properly admitted."

And in Maxwell v. Harper, 51 Wash. 351, 98 P. 756, the Washington Supreme Court upheld the admissibility of the attorney's testimony in a case involving a deed placed in escrow to be delivered at death.

These cases and others are cited in 70 C. J. 438, 439, section 587(2), in support of the text:

"It is generally considered that the rule of privilege does not apply in litigation, after the client's death, between parties, all of whom claim under the client."

The rule is sound in principle. Where the validity of an instrument, shown to have been executed by a decedent, is attacked on the ground of fraud or mental incompetency or undue influence, the same rule should prevail whether it be a will or a conveyance inter vivos. We have applied it as to cases involving wills. We should be consistent and hold it operative here.

Our conclusion is that the decision of the trial court should be affirmed.—Affirmed.

GARFIELD, C. J., and BLISS, OLIVER, HALE, and MULRONEY, JJ., concur.

WENNERSTRUM and MANTZ, JJ., dissent.

HAYS, J., takes no part.

MANTZ, J. (dissenting)—I respectfully dissent from the majority opinion.

Involved in this appeal are two equity actions, which were by stipulation consolidated in the court below and by like stipulation consolidated in this court for the purposes of appeal.

One action was to set aside and cancel a deed by August Olson wherein he conveyed his real estate to his guardian, Regina Pierson, and her aunt, Edith Benna. The other action was to set aside and cancel a bill of sale to the guardian whereby Olson's personal estate was transferred to such guardian. Both instruments were drawn on January 25, 1941, but were dated January 24, 1941. The action was brought by two brothers of August Olson who live in Sweden. Each of the instruments in question was attacked on the ground of Olson's lack of mental capacity, and on the further grounds of constructive fraud and undue influence, predicated upon the fact that the grantee, Pierson, was Olson's guardian at the time the instruments were executed. The trial court denied plaintiffs' claims of undue influence, holding that Olson possessed the requisite mental capacity and that there was no constructive fraud involved. Plaintiffs have appealed.

I. August Olson, whose property is involved in this litigation, was born in Sweden and came to America in 1889, at the age of twenty-six. He went to Albert City, Iowa, to the farm home of Mrs. C. J. Blomberg, a cousin, his nearest kin in this country. Following his arrival here, Olson worked on the railroad section and as a farm laborer and managed to acquire two farms: one, unimproved, of forty acres in Buena Vista county; and an improved eighty acres in Pocahontas county. In addition, in January 1941, he had money and other personal property of something less than $5,000 in value. While the record is not clear on the point, we think it can be fairly inferred that the real estate was worth at least $15,000.

Olson lived with the Blombergs until they moved to town, about 1916, and had a room in their home where he kept his trunk. He made their home his headquarters when not working. When the Blombergs moved to town Olson changed his headquarters to the farm home of Andrew and Elsa Aronson, Elsa being a daughter of the Blombergs. From 1916 until he quit working, about 1930, he had a room in the Aronson home, kept his trunk there, and was there when not employed. About 1935, on account of his age and poor health, Olson quit working regularly and spent most of his time with the Aronsons.

In the spring of 1939 the Aronsons moved to another set of improvements on the farm, leaving a son and daughter, Lillian, in charge of the old home, where Olson was then confined on account of ill health. Lillian and a sister, Viola, cared for Olson until the spring of 1940. While there Olson's health was failing and he was quite feeble. In April 1940, upon recommendation of a Dr. Almquist of Albert City, Olson was taken to the Lutheran Hospital at Fort Dodge, where he remained three days under the care of Dr. Schultz of that city. Olson returned from Fort Dodge to the Aronson home and shortly thereafter appointed C. E. Kindwall of Albert City as his agent, under power of attorney, to manage his affairs. His health continued to fail and on May 4, 1940, he was taken to the Swallum Hospital at Storm Lake, where he remained until the following October 22d. On October 24, 1940, he was taken to Axtell, Nebraska, where he was admitted to the Bethphage Mission, an institution maintained by a Swedish organization operating a home for epileptics, feeble-minded, and otherwise unfortunate persons. In 1939, Olson executed a will, giving this institution his entire estate. He was at Axtell until January 7, 1941, and then returned to the Aronson home, where he stayed until March of the same year. Following this he stayed with various persons: with Edith Benna until June; from June to October, with Roy and Lillian Schultz (formerly Lillian Aronson). Subsequently he stayed with various persons: Edith Benna, the Aronsons, Minnie Spar, and Mrs. Carlson, of Storm Lake, where he died on October 3, 1943, aged eighty years.

Olson left a sister and three brothers in Sweden when he came to America. He revisited Sweden twice, the last time in 1931. The sister and one brother predeceased him and he left as his heirs at law two brothers, appellants herein. His relations with his brothers were cordial. Following his last visit he made a will giving his property to his "beloved" brothers. Sometime after he appointed Kindwall as his agent Olson requested Aronson to take him to Storm Lake, as he expressed a desire to have Regina Pierson appointed as his guardian. He said nothing about transferring his land or personal property. Prior to that he told various persons that Kindwall was taking his money at the bank. On the forenoon of January 25, 1941,

Aronson and a neighbor, Carl Anderson, took Olson to Storm Lake, taking him to the courthouse, where Miss Pierson was county recorder. They went to her office. Miss Pierson, being advised of Olson's mission, assented to being appointed as his guardian. She called the county attorney, Paul Turner, who prepared the necessary papers for the guardianship and procured a bond for the guardian and the appointment was made by the clerk of court. Sometime later—possibly the same day— at his office, Turner prepared for Olson a deed of all of his real estate to Regina Pierson and Edith Benna, reserving a right to the income; and also a bill of sale to his personal property to Regina Pierson. While the two instruments were made on January 25, 1941, they were, at Turner's suggestion, purposely dated January 24, 1941. At the same time Turner prepared an escrow agreement or direction whereby Turner was to retain the transfers until Olson's death and in that event was to make delivery.

In the guardianship proceedings Turner represented Miss Pierson, the guardian, and following Olson's death was appointed administrator. The deed and bill of sale, while made on January 25, 1941, were predated January 24, 1941, and were not acknowledged until October 1942. The acknowledgment purports to have been made on February 24, 1941.

Shortly following the opening of Olson's guardianship, without the knowledge, permission, or approval of the guardian, Turner went to Albert City and there secured from Olson's box at the bank the 1939 will and typed a revocation on the back thereof, and then had Olson sign it, with Turner as a witness. In October 1942, Turner secured one Estes as a witness to the revocation. Following the opening of Olson's estate Turner was appointed administrator.

The guardian, Regina Pierson, as a child had known Olson. Her parents operated an eating house in Albert City many years before and their acquaintance dates from that period. Later Regina and her mother moved to Storm Lake and the acquaintance was not renewed until shortly before she was appointed guardian of his person and property. Edith Benna, one of the grantees of the Olson deed, was an aunt of Regina Pierson, but had no particular friendship with Olson. Accord-

ing to Regina's mother, they had not seen Olson for ten years prior to the time he was confined in the Swallum Hospital.

As before stated, appellants brought suit to set aside the deed and transfer on the ground that at the time they were made Olson lacked mental capacity, and on the ground of constructive fraud, predicated upon the fact that Regina Pierson was Olson's guardian at the time the instruments were executed. The court denied appellants' claim, holding that Olson was competent to make transfers, that there was no undue influence or constructive fraud as claimed by appellants.

The statements and recitals hereinbefore set out are a brief outline or summary of the events leading up to and involved in this appeal. Later in this dissent, in the discussion of questions raised, other parts of the evidence will be set forth.

Appellants have set forth and rely upon two propositions, either of which they claim entitles them to a reversal of the decree of the trial court. Both of these propositions follow and are along the lines of the appellants' pleadings. I shall in this dissent set out and deal with both propositions, either of which, in my opinion, justifies a reversal herein.

Appellants contend that because of the fiduciary relationship of guardian and ward existing between the appellee Pierson and the decedent at the time of the attempted transfers the same are, prima facie, vitiated by constructive fraud. In order to overcome this defect it was necessary for appellees to establish affirmatively the four following propositions, and they have failed to meet this burden of proof as to each of them:

(a) That Regina Pierson acted with the utmost good faith in the transaction.

(b) That Olson had the advantage of competent and independent advice concerning the transaction.

(c) That Olson, in executing the instruments, had full knowledge of the facts involved, including the nature and effect of the transaction.

(d) That the transaction was free from undue influence on the part of the appellee Pierson.

In my opinion all of such matters must be shown and the burden to do so is upon appellees.

I shall take up and consider the proposition above set forth

—that dealing with the alleged fiduciary relation existing between August Olson and his guardian, Regina Pierson, on January 25, 1941.

It stands uncontradicted in the record that the instruments in question were gifts inter vivos. These were placed in escrow, were irrevocable, and had the effect of transferring to the donees all of Olson's property save the income thereof. No claim is or can be made that there was any consideration for such gifts. The property transferred was of the approximate value of $20,000.

Appellants, in brief and argument, say:

"The defendants failed to establish affirmatively that the decedent acted with full knowledge of all the essential facts, including the effect of the transaction."

At the time the transfers were made Regina Pierson was the guardian of the person and property of August Olson. Attorney Turner so testified; the bill of sale specifically so shows. The bill of sale under which Regina claims the personal property recites:

"I, August Olson * * * has this day sold, and by these presents do Grant, Bargain, Sell and Convey unto Regina Pierson * * * the following described Goods and Chattels, now in the possession of the said Regina Pierson, *as my guardian.*" (Italics supplied.)

Evidently the majority opinion attached little importance to this.

It is thus quite apparent that Turner acted for the guardian, and under the record there can be no question but that Regina Pierson, as guardian, stood in a fiduciary capacity toward August Olson. Turner, in acting for Olson, certainly occupied a confidential relationship toward his client.

As the record shows gifts from decedent to the guardian, absolutely without consideration, under familiar rules of law they were presumptively fraudulent, and to sustain them the burden is upon the donee to establish that in acquisition of the gifts no advantage was taken of the donor by reason of such relationship but that the donor acted voluntarily and with free-

dom, intelligence, and full knowledge of all of the facts. Marron v. Bowen, 235 Iowa 108, 16 N. W. 2d 14; Merritt v. Easterly, 226 Iowa 514, 284 N. W. 397; Curtis v. Armagast, 158 Iowa 507, 138 N. W. 873; Pruitt v. Gause, 193 Iowa 1354, 188 N. W. 798; Johnson v. Johnson, 196 Iowa 343, 191 N. W. 353; II Restatement of the Law, Contracts, section 498; 25 Am. Jur. 130, Guardian and Ward, section 208; Pirkl v. Ellenberger, 179 Iowa 1122, 162 N. W. 791. In the last-cited case, this court, speaking through Gaynor, J., sets forth clearly the reason for the rule distinguishing between gifts inter vivos and testamentary dispositions.

In Pruitt v. Gause, supra, 193 Iowa 1354, 1359, 188 N. W. 798, 801, in dealing with the effect of fiduciary relations where a father made a deed to his son conveying all his property to the son, this court said (Weaver, J.):

"There is no pretense, even by the defendant, that the old gentleman had the opportunity or advantage of independent advice from any source, and this fact alone has often been held sufficient to set aside deeds and contracts obtained under such conditions." Citing, among other cases, that of Curtis v. Armagast, supra.

One of the latest pronouncements upon that subject is found in the case of Dibel v. Meredith, 233 Iowa 545, 551, 10 N. W. 2d 28, 31. In the last-cited case this court found that a husband of a donee stood in a confidential relation to the donor. In discussing that matter, this court used the following language:

"The force of the holding is that where one person stands in a confidential relationship to another he will not be permitted to retain advantages of a transaction with the other person when they may reasonably be the result of confidence reposed, unless he shows that the other party acted with freedom, intelligence, and full knowledge of the facts, and had an opportunity to secure competent and impartial advice from some person other than the donee. In passing upon such transactions, courts of equity will scrutinize with jealous vigilance, and in the end will require the dominating party to a confidential relationship to conduct himself in his dealings with the other with the utmost

good faith. It was likewise held that the donor was entitled to have independent advice. 'Independent advice' in this connection means the showing that the donor had the benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect but who was furthermore so disassociated from the interests of the donee as to be in a position to advise the donor impartially and confidentially as to the consequences to himself and of his proposed benefaction. Post v. Hagan, 71 N. J. Eq. 234, 65 A. 1026, 124 Am. St. Rep. 997.''

When August Olson made the deed and bill of sale to Regina Pierson the relationship of guardian and ward existed between them. Speaking of the relative rights of a ward in dealing with a guardian, we call attention to the language of the text found in 25 Am. Jur. 131, section 210:

''It is a rule of universal recognition that a guardian, in purchasing or otherwise acquiring the property of his ward, violates the duty imposed by the fiduciary character of his position.''

In 3 Pomeroy's Equity Jurisprudence, section 961, we find the following:

''The equitable rules concerning dealings between guardian and ward are very stringent. The relation is so intimate, the dependence so complete, the influence so great, that any transactions between the two parties, or by the guardian alone, through which the guardian obtains a benefit, entered into while the relation exists, are in the highest degree suspicious; the presumption against them is so strong that it is hardly possible for them to be sustained.''

See, also, Hindman v. O'Connor, 54 Ark. 627, 16 S. W. 1052, 13 L. R. A. 490; Burel v. Baker, 89 Ark. 168, 116 S. W. 181.

In Hindman v. O'Connor, supra, in discussing dealings between guardian and ward, the court said:

''As a general rule, a party occupying a relation of trust or confidence to another is, in equity, bound to abstain from

doing everything which can place him in a position inconsistent with the duty or trust such relation imposes on him, or which has a tendency to interfere with the discharge of such duty." 54 Ark., at page 632, 16 S. W., page 1053.

In the recent case of Hansen v. Waugh, 237 Iowa 304, 21 N. W. 2d 762 (will contest), this court held that the maker of an instrument attacked on the grounds of undue influence was entitled to independent advice.

In the present case the record shows that Olson, sometime prior to the making of the transfers on January 25, 1941, had appointed as his agent one C. E. Kindwall, a banker and an old friend, who acted through a power of attorney; that later Olson became dissatisfied and informed some of his relatives that he was going to have Regina Pierson appointed as his guardian. At his request a relative, Andrew Aronson, took Olson to Storm Lake, Iowa, and to the office of the county recorder, Regina Pierson, and at the request of either Olson or Aronson, Regina consented to accept the guardianship; Regina then called Paul Turner, the county attorney of Buena Vista county, who had an office in Storm Lake, Iowa. At the request of Regina, Turner prepared the petition for guardianship and same was signed by Olson. Turner had charge of the preparation of the necessary papers and was instrumental in having the appointment made. As a witness Turner testified that during that time and subsequently he was acting as attorney for Regina Pierson. He was a stranger to Olson and had never seen him before. According to Turner's own admission, Olson told him that he wanted a guardian; one was applied for, with Turner in charge of the proceedings; Turner said that Olson then went with him to his office, where they talked about Olson's disposing of his property; that Turner suggested a will but Olson did not want a will, saying if he made a will the lawyers would get the property. Turner testified that Olson did not want a will and then said:

"A. I went ahead and did these things that he wished me to do and I asked him again if that was what he wanted; I remember that. * * * Q. And that's all the advice you gave him, wasn't it? A. As I recall, that was all that day."

"These things" mentioned in the answer as shown by the evidence were the deed, transfer, and escrow agreement. Turner testified that at the time he drew the instruments in question he had in mind the fact that Olson might need some of the corpus of his property for his own purposes prior to his death; also, that by having the deed placed in escrow for him Olson deprived himself of the right to dispose of the real estate for his own use. Nevertheless, Turner failed to say a word to Olson warning him of this very vital feature of the transaction. On cross-examination Turner, speaking of this matter, said:

"I realized that he might have to use not only the income from his land, but he might have to mortgage the land or even dispose of some of it."

We quote from the examination of Turner on this matter:

"Q. And when you drew these instruments you had that in mind? A. Yes, I realized that he would need that. Q. It was your opinion that when he delivered that deed to you that you could not return it to him, was that your opinion? A. That was my opinion, yes sir. Q. And yet you never said a word to him that that placed his property beyond his control, so far as to dispose of the corpus was concerned, is that right? A. I don't believe I mentioned that particularly. Q. Didn't say a word to your client about the possibility of his needing to use a part of the corpus of his property while he still lived? A. I don't believe I did. I think the only thing I discussed with him was he would need the income. Q. What independent advice did you give Mr. Olson, Mr. Turner? A. I didn't give him much advice. I did what he wanted me to do; I drew up the papers."

I am unable to conceive under the record how the foregoing could be considered competent and independent advice even if it should appear that Turner was a competent witness. Turner was dealing with a stranger, a man seventy-eight years old. Turner says, "He was a feeble man. He was old. He could not see very well." The application was prepared by Turner and states that Olson was seventy years old and had $500 in the bank. The record shows Olson was seventy-eight years old and

had something like $3,500 in cash. Turner seems to feel that doing as Olson wanted him to do was all that Turner was required to do, when he said: "I went ahead and did these things that he wished me to do." Turner knew that Olson wanted a guardian for his property, and yet within a few hours thereafter he prepared instruments wherein Olson stripped himself of both title and control, and without consideration transferred about $20,000 worth of property. I call attention to the language of this court, in the case of Hull v. Mitchell, 181 Iowa 51, 65, 162 N. W. 235, 239. Therein this court, speaking through Justice Ladd, said:

"Whatever the attorney may have said, everything he did was inimical to the interests of decedent and in the interest of defendant, and, in the light of this record, it is all but incredible that he was acting for anyone other than the defendant."

On the question of the rights and obligations existing between a grantor and a grantee, where the claim is made that a fiduciary or confidential relation existed between the parties, I call attention to the holding of this court in the case of Merritt v. Easterly, supra. In that case, Bliss, J., speaking for the court, discussed that matter at considerable length and cited many cases from this state dealing directly therewith. In that case, as in the present case, the grantee claimed the property was transferred as a gift and had been made voluntarily to compensate for services rendered and kindness bestowed upon the grantor.

The same claim is made in the present case: that Regina Pierson, as a child and later, was friendly with August Olson; that she spoke to him and visited with him when some others did not; that she visited him a few times when he was at the Swallum Hospital and was kind to him and that he appreciated her kindness; that a genuine friendship existed between them.

I desire to quote two paragraphs from the Merritt case, supra, 226 Iowa 514, 518, 284 N. W. 397, 399, as follows:

"The phrases [confidential or fiduciary relations] are used by the courts and law writers as convertible and synonymous terms. Bacon v. Soule, 19 Cal. App. 428, 126 P. 384; Ewing

v. Ewing, 33 Okla. 414, 126 P. 811. We have no intention of fettering the operation of the principles which have been consistently followed by this and other courts in cases of this kind by undertaking to define the various confidential, or fiduciary relationships, or the precise limits thereof.

"No witness in this case testifies to any false, or fraudulent representations which the appellant made to the deceased, or to any deceit or trickery which he practiced upon her. In the view which we take of the case such proof is not necessary to support the decree. As stated by this court in Burger v. Krall, supra, 211 Iowa 1160, on page 1167, 235 N. W. 318, on page 321:

" 'The circumstances loudly cry fraud; but if there is doubt about the sufficiency of the evidence to show actual fraud, equity, from the proved relationship and the advantage obtained by the defendants therein, implies fraud, and demands of defendants proof that decedent, in extending to defendants the profits and advantages which they now claim, acted with freedom, intelligence, and full knowledge of all the facts.' "

Thus it will be observed that this court held in that case, and also in the case of Utterback v. Hollingsworth, 208 Iowa 300, 225 N. W. 419, that where there was shown to exist a fiduciary or confidential relationship and an advantage was obtained by the grantee or donee, fraud was implied, and that the person receiving such benefits must show that the grantor acted with freedom, intelligence, and full knowledge of all the facts. As further supporting the rule, see cases cited at page 516 of 226 Iowa, page 397 of 284 N. W., Merritt v. Easterly, supra.

I might say at this point that the trial court, in the finding of fact dealing with the testimony of Turner and his activities and actions in the guardianship and the dealings with Olson, called attention to some rather unusual, not to say peculiar, angles of his activities. Without the testimony of Turner I do not see how either of the instruments in question can stand. All of the dealings whereby the deed and bill of sale were drawn were between Turner and Olson. Olson's friends, Aronson and Anderson, who had taken him to Storm Lake and assisted him

in getting a guardian, knew nothing of the deed and bill of sale until afterward; Turner knew they were with Olson and their purpose in being there. The trial court evidently gave much weight to the testimony of Turner, and in so doing used the following language:

"If the transaction did not take place at the time and in the manner as testified to by the witness Turner, then this witness would not only be a defrauder but a perjurer of the lowest order and certainly unworthy of any office or trust."

The trial court, referring to the objection to the testimony of Turner that it violated section 11263, as it revealed confidential communications between attorney and client, stated that in the view of the trial court Turner was simply a scrivener and that Turner was a competent witness and that whatever objection the plaintiff made to Turner's competency was waived by cross-examination by plaintiffs. The majority opinion takes another view of this matter and holds in effect that while Turner was the attorney of Olson, yet his evidence did not violate the statute as being a confidential communication. As a witness Turner did not claim to be simply a scrivener; he said that he was trying to act as his (Olson's) lawyer. He mentions Olson as a client. I will set out questions and answers from his cross-examination:

"Q. Mr. Turner, if Mr. Olson had come to you—you were his attorney in this whole transaction, were you or weren't you? A. I would be his attorney, yes. Q. You were his attorney when you got those deeds from him, weren't you? A. Yes, I was."

As to relationship of attorney and client, see Graham v. Courtright, 180 Iowa 394, 161 N. W. 774; Loder v. Whelpley, 111 N. Y. 239, 18 N. E. 874.

In concluding that Turner in drawing the deed and bill of sale for Olson was simply a scrivener the court may have overlooked the distinction between that person and a lawyer. A scrivener simply follows direction in preparing written instruments. A lawyer, while he may in some instances act as a scrivener, fills a larger field: he counsels and advises and acts for another. The record shows that Turner consulted with Olson

and gave advice. First, Olson distrusted the consequences of a will, and Turner suggested a deed; Turner advised Olson that the deed would not pass his personal property and advised that a bill of sale would have to be made to convey the same; further, he advised the escrow agreement. Turner said he was acting as attorney for Olson. I accept his statement to that effect. Appellants had objected to Turner's testimony as to his dealings with Olson in making the deed, bill of sale, and escrow agreement under section 11263, Code of 1939. To this objection the trial court said in effect that, even if good, it had been waived by cross-examination. The court cites no authority on this point. In the fairly recent case, In re Estate of Custer, 229 Iowa 1061, 295 N. W. 848, in dealing with that matter, this court held that where objection was made that the witness was incompetent to testify under the "dead man statute" (section 11257, Code of 1939, section 622.4, Code of 1946), and where objection is a standing one to such testimony, the objection is not waived by cross-examination, even if the matter be brought out on cross-examination. Various Iowa cases are cited in the Custer case. See Peacock v. Gleeson, 117 Iowa 291, 90 N. W. 610; Donnell v. Braden, 70 Iowa 551, 30 N. W. 777; Metropolitan Nat. Bk. v. Commercial State Bk., 104 Iowa 682, 74 N. W. 26. I quote one sentence from the Custer case, wherein the court quoted from the case of Peacock v. Gleeson, supra, at page 1070 of 229 Iowa, page 854 of 295 N. W.:

" 'Some propositions in practice ought to be treated as too well settled to require vindication, and that pertinent cross-examination waives nothing is one of them.' "

There are a number of things in the record in which Attorney Turner took part which are rather unusual. The application for guardianship prepared by Turner recites that Olson was then seventy years old and had personal property, etc., of the value of $500. Olson was then seventy-eight years old and had personal property valued at about $5,000. When Turner drew the deeds and bill of sale he dated them the day before they were actually drawn. The record shows the bias of Turner in the whole matter. While he was a witness in the case, his own evidence shows that he took an active part in preparing the

defense to this action, advising with regard to a deposition, consulting with counsel for the defense, and interviewing witnesses. A few days following the appointment of the guardian, unbeknown to the guardian, Regina Pierson, and without her permission or approval, he went to Albert City and while there examined the contents of Olson's safety box therein, and took back with him to Storm Lake a will which Olson had executed in 1939; he typed a revocation on the instrument, had Olson sign the same, with Turner as a witness, but did not secure another witness to the revocation until October 1942, over one and one-half years after the deed and bill of sale; the deed and bill of sale, while made January 25, 1941, were, at Turner's suggestion, dated January 24, 1941, but neither instrument was acknowledged until October 1942, at which time Turner instructed the notary to take the acknowledgment as of January 24, 1941. The acknowledgment, however, bears date of February 24, 1941. While Turner was acting as attorney for Olson and retained the deed and bill of sale, yet I find that he informed Regina Pierson of that fact on the day she was appointed guardian. While the guardianship matter was not litigated in court, yet Turner, apparently without the knowledge of Regina Pierson, the guardian, secured the services of Attorney Whitney to act with him therein. According to the guardian, she did not know why the second attorney was secured.

Both Regina Pierson and Edith Benna testified to conversations and dealings with August Olson after the time they became grantees in the deed and bill of sale. Their testimony was objected to on the grounds that both were incompetent under the "dead man statute." The trial court in its finding held that the objection was good, and the ruling of the trial court was correct. I think the rulings were correct. Appellants make no claim that the fraud was other than constructive.

The majority opinion seems to question the existence of any confidential or fiduciary relation at the time the deed and bill of sale were executed. The record shows that the petition for appointment, the bond, and order were all made out before Olson ever went to the office of Attorney Turner. Turner as a witness said: "Before I took Olson to the office I had completed

the matter of the appointment of the guardian at the time.'' The fact that these instruments were filed the same day is of little or no significance. They would be effective without being filed. The filing is simply for the record. At any rate, the record shows that Olson made but the one trip and left hours before the filing date of the guardianship papers.

There seems to be a suggestion in the majority opinion that the claim of the fiduciary relationship between Regina Pierson and Olson is rather technical. Well, the record shows otherwise. Regina Pierson called Turner. Turner acted for her—he says so; she says she paid him; he followed the employment to the end of a three-year routine guardianship, and the probate files show that the guardian was paid about $550 for her services, while Turner received for his services $240. The net receipts of the guardianship (aside from a legacy from Sweden) were $4,046.34. Regina Pierson's reports recite that Turner was her attorney from the start. Orders of court prepared by Turner approving guardianship proceedings recite that Turner was attorney for the guardian.

The majority opinion makes the statement, ''Nor does the record bear out the contention that Mr. Olson, in making the conveyances, was without independent legal advice * * *.'' In gifts inter vivos where a fiduciary or confidential relationship is shown the burden is upon the donee or grantee to show that fact. Turner says that he gave Olson no independent legal advice. There is not a word in the record to show that Olson was ever advised on the matter of the conveyances by any lawyer but Turner. The cases cited above hold that such advice must be shown to have been independent and impartial. Certainly, a man weak in body and mind ought to have fair, impartial, and independent advice before giving away substantially all of the savings of a lifetime—approximately of the value of $20,000— to strangers to the blood, simply because one of the grantees was needy and the other had been kind to him years ago. Certain rules have been created to protect such people and I for one am not in favor of ignoring them on the grounds of sympathy or expediency. See cases above cited, particularly, Curtis v. Armagast, supra; Dibel v. Meredith, supra; 3 Pomeroy's Eq. Jur., section 961, supra.

I am of the opinion that under the record herein neither the deed nor the bill of sale can stand. I feel that there was such a fiduciary relation existing between August Olson and Regina Pierson as to render both fraudulent in law and that the showing made by appellees to overcome such presumption falls far short of so doing. At the time the deed and bill of sale were made Regina Pierson was guardian of both the person and property of August Olson. The bill of sale signed by Olson recited that Regina Pierson was then guardian; in procuring her appointment as guardian Paul Turner acted as her attorney; he prepared the necessary papers and handled the matter in court and was paid therefor by Regina Pierson. Later, the same day, Turner took Olson to his office and drew the deed and bill of sale and in so doing acted as his attorney. Turner admits that when he prepared said instruments Olson did not have any independent advice, and further, that he (Turner) did not advise grantor of the consequences of the steps he was taking. Further, I am of the opinion that when Turner prepared the two instruments, the relationship of attorney and client existed between him and Olson and that under the statute (section 11263, Code of 1939, section 622.10, Code of 1946), and by reason of such relationship, Turner was incompetent to testify. Without the testimony of Turner appellees have not been able to establish their defense made necessary by reason of the fiduciary relation between Olson and Regina Pierson. On this ground alone I would sustain the claim of appellants.

II. The other proposition which appellants set out and argue is their claim that August Olson was mentally incompetent to execute the deed and bill of sale on January 25, 1941. Many witnesses were called and testified on this question. It covered a period of many years. The trial court, in the finding of fact, rather implied that there had been such a showing by the appellants on the ground of mental incapacity of August Olson that the burden was cast upon appellees to rebut such showing and that they had succeeded in doing so, holding that the evidence showed that on January 25, 1941, August Olson was competent to give away all of his property. In so doing the trial court considered the testimony of Paul Turner, an attorney of Storm Lake, who not only represented Regina Pierson in the

guardianship proceedings but also August Olson when he made the deed and bill of sale to the guardian. I am of the opinion that the objection to Turner's testimony on the ground that there existed at the time, of such proceedings the relationship of attorney and client should have been sustained and his testimony concerning such matters should have been disregarded. Whether August Olson was mentally competent to make the deed and transfer on January 25, 1941, is a question of fact.

In this dissenting opinion I will set forth parts of the record bearing on that question. Summed up, I am of the opinion that there is in the record ample evidence to warrant a finding that from 1939 down to January 25, 1941, August Olson was a person of unsound mind; that about 1939 his mind began to fail; that his mental weakness was such that he did not retain sufficient mental capacity to enable him to transact business. Mental incapacity once being shown, the same condition is presumed to exist in the future. Corbit v. Smith, 7 Iowa 60, 71 Am. Dec. 431; 28 Am. Jur. 752, section 122; Mileham v. Montagne, 148 Iowa 476, 125 N. W. 664; In re Will of Knox, 123 Iowa 24, 98 N. W. 468.

In the finding of fact the trial court evidently felt that the evidence on behalf of appellants showed that at the time of the deeds and transfer by August Olson there was warranted a finding of mental incompetency. I quote from such finding:

"Under the rule as stated In re Knox's Will, 123 Iowa 24; Mileham v. Montagne, 148 Iowa 476; 32 C. J. 757, the burden rests upon the defendants to prove that on the day the deed and bill of sale were executed Olson was mentally sound, sufficient to realize and know the extent of his property, the natural objects of his bounty, and the nature and effect of the transaction or instruments he then executed."

The trial court, at the conclusion of the findings of fact, said:

"* * * this court is of the opinion that whatever burden has been placed upon the defendants to show mental competency at the time the instruments were executed has been fully met and that August Olson was of sufficient mental capacity at the time of executing the instruments to know the requirements imposed

by law, namely: the extent of his property, the natural objects of his bounty, the nature of the instruments and to whom he wanted to give his property, and that at that time he had the benefit of independent advice. The court, therefore, finds under the facts and the law there was neither fraud nor undue influence on the part of the defendants; neither was there mental incapacity sufficient to render the deed of conveyance and the bill of sale invalid.''

It seems to me that it is somewhat difficult to harmonize the two statements. In the first, the court seems to imply that appellants have made such a showing as to the claimed mental incompetence of August Olson on January 25, 1941, as to cast upon defendants (appellees) the burden of overcoming this showing; while in the last statement the court uses the expression that "whatever burden" has been placed upon defendants to show that August Olson on January 24, 1941, was again competent had been fully met.

Certainly, under the record herein, there can be no question as to the nature of the burden of appellees in case appellants made a showing of mental incapacity; the evidence in the record amply shows such fact. I think it advisable at this point to set forth from the record evidence bearing on the question of the mental competency of August Olson beginning with such condition in 1939.

Dealing with the question, the record contains much evidence, some by medical men and some by laymen. Some of the evidence in the record from laymen was given by close friends and relatives of August Olson. When Olson came here from Sweden in 1889, he was twenty-six years old. He came to the home of his nearest relative in America, Mrs. Carl Blomberg, a cousin, who, with her family, lived on a farm near Albert City, and until the Blombergs retired in 1916, Olson made their home his home, having a room there where he kept his trunk, and to this place he came when not working at other places. He then went to live with Andrew Aronson on a farm near by. Mrs. Aronson was a daughter of the Blombergs. Later, when the Aronsons went to another set of improvements on the farm, Olson remained at the same farm home with various children

of the Aronsons. In both of these places the rooming arrangements were the same as those at Blombergs. All told, Olson spent close to a half century near or with his relatives near Albert City. Some of these relatives were witnesses. None of them had any claim to the estate or property of Olson; the setting aside of the deed and bill of sale will not benefit them. There is in this record much evidence that Olson was quite attached to his relatives and that over this long period of time they were kind to him and assisted him in various ways.

Beginning sometime in 1939 it became apparent to some who came in contact with Olson that he was failing, both mentally and physically, and his friend and banker, noting his condition, advised close friends and relatives of Olson to have some person appointed to take charge of his affairs. Dr. Almquist advised that Olson enter a hospital at Fort Dodge. Olson was at the Fort Dodge hospital but a few days and, due to his restless and unsettled condition, was sent back to the Aronson home. This was during the month of April 1939. While there he was attended by Dr. A. A. Schultz. Dr. Schultz had been in the practice of his profession since 1911; was not a general practitioner; he was a specialist in internal medicine and a. Fellow of the American College of Physicians. He examined Olson on April 16th, 17th, and 18th; his diagnosis of Olson was "senile dementia; cerebral arteriosclerosis, hypertrophic arthritis of the dorsal and lumbar spine." Dr. Schultz said:

"Senile dementia is a progressive mental enfeeblement which comes on at the period of senile involution and is a result of organic changes in the brain, particularly arteriosclerosis. It develops gradually, becomes progressively worse, is not intermittent and results in definite mental symptoms. There is a gradual decline of psychic functions, together with a slow change in character manifested by irritability, poor memory for recent events, periods of depression, suspicion, and, sooner or later, the development of various types of delusions. If the patient lives long enough, he finally becomes completely demented and recognizes no one."

Dr. Schultz was of the opinion that in April 1940 Olson was a person of unsound mind. Witness states it was his

opinion that, as a result of mental enfeeblement and the presence of various delusions, Olson did not have sufficient mental capacity to understand and keep in mind who were the persons who would naturally receive his property. The witness said on cross-examination:

"I consider a person of unsound mind when he is deprived of reason to the extent that he is no longer capable of understanding and acting with discretion in the ordinary affairs of life."

On May 4, 1940, Olson was taken to the Swallum Hospital at Storm Lake, Iowa, and remained there until October 22, 1940. While there he was in the charge of Dr. J. A. Swallum, a physician and surgeon of forty-four years' practice in Storm Lake. Dr. Swallum operated the hospital and had had charge of hospitals for over thirty years. Dr. Swallum observed Olson regularly and talked with him at various times. Witness gave it as his opinion that during the time Olson was in the hospital he was of unsound mind. ·Witness said that at times Olson talked rationally, at other times he was irrational; that he had delusions. We quote from the record a question and the answer:

"Q. You think, Doctor, that during the time he was under your observation he was competent to transfer all of his property and especially transferring it to people who were no relation to him and had no business connections with him at any time prior to that time? A. No."

Storm Lake is something like twenty miles from Albert City. While Olson was in the hospital there quite a number of his relatives and friends visited with him. As witnesses some of them said that at times he seemed rational and visited; others testified that he was incoherent at times, claiming that he was being mistreated, that people had taken his property and had tried to poison him.

Two days following his leaving the Swallum Hospital Olson was admitted to the Bethphage Mission of Axtell, Nebraska, a church organization which operates a home for epileptics, feeble-minded, and otherwise unfortunate persons. He remained there until January 7, 1941. Arthur A. Christensen, director of that

institution, told of various contacts with Olson while there. Olson insisted that he had given the institution $3,000. The evidence is no such sum had been paid; Olson was to pay $30 per month and $75 was paid after he left. Witness testified that Olson threatened to hang himself unless sent home. Witness was of the opinion that during the time Olson was at the Mission he was of unsound mind, and based his answer partly on observations and partly because Olson accused the doctor at Storm Lake, also the Mission attendants, of putting poison in his medicine. Witness further stated:

"Olson is not to be depended upon in his statements. His mind is not dependable. The fact that he accused the doctor in Storm Lake of putting poison in his medicine, and the fact that he insisted that he would die in two months, are evidence of this."

In addition to the testimony of Dr. Schultz, Dr. Swallum, and Johnson, director of the Mission at Axtell, Nebraska, there was the testimony of Dr. Obermann, Superintendent of the State Hospital for Insane at Cherokee. Later in this opinion I will refer to the testimony of Dr. Obermann.

I will next take up and consider the lay testimony as to the mental condition of August Olson; it covers quite a wide range and the period from about 1939 until his death in 1943.

Olson quit working in the early thirties. From that time on there was a gradual decline in his physical and mental power. In 1939, one Wenell, the local assessor, in attempting to assess Olson found him utterly unable to give the assessor an intelligent statement concerning his property. This witness visited Olson at the Swallum Hospital, noticed delusions, manifested by Olson; also noticed delusions before he entered the hospital. C. A. Kindwall, of Albert City, had known Olson for about fifteen years; Kindwall is a banker of twenty-five-years' experience at Albert City; Olson did business at Kindwall's bank, where he had deposits, certificates, etc. Kindwall attended to Olson's taxes. Olson talked to Kindwall about making him a will and later two were prepared for him and executed. On May 3, 1940, Olson designated Kindwall agent, through a power of attorney, and he acted thereunder until late in January 1941, attending to the farms, supervising buildings, leasing, etc. Shortly after giving

Kindwall the power of attorney Olson entered Swallum Hospital; Kindwall visited him there several times. On one of these trips Olson said that they had taken all his money, had stolen his clothes; that they would not let him have food but kept it locked up; said that they had gotten his crops and at night were coming around after dark with papers to get his farms. Olson told witness before that the Aronsons were trying to poison him out there by putting tablets in his coffee. Olson wanted to leave the hospital and cried and wanted Kindwall to take him home. Olson left the Swallum Hospital and went to the Aronsons and in a short time went to the Mission at Axtell, Nebraska, Kindwall having made part of the arrangements for his going there. Olson came back early in January 1941. Kindwall did not pay the Mission $3,000 but sent the $75 to pay the bill. I quote from the testimony of Kindwall:

"I believe he mentioned about his being poisoned once or twice when he was in the bank. A number of times when he was in the bank he was always talking about that they were taking his money and were trying to poison him. The occasion when the power of attorney was made out was the first occasion he made the statement about his being poisoned, and he made that statement to me personally after that. I think it was shortly after he was discharged from the Swallum Hospital. He said that—he was complaining that everybody was taking his money; that they were also trying to poison him. I don't know as he mentioned who in this one or two times in the bank, but out at Aronsons that day he spoke about—said Aronsons. I don't recall that he said anything about them trying to poison him while he was in the Swallum Hospital. I don't recall any other statements now that he made in my presence as to people taking his property or poisoning him."

Kindwall gave it as his opinion, based upon dealings and contacts with Olson, that the latter was mentally incompetent on January 25, 1941, and as such was not capable of making the deed and bill of sale and was not able to understand and comprehend the effect of such transfers and did not know the natural objects of his bounty. Various other witnesses who had known Olson for years gave testimony as to delusions on the

part of Olson: that people were stealing his farms, his money, and his crops; that they were taking everything, even his clothes; that they were trying to poison him—the Aronsons, where he had lived for years; also that the doctors and nurses were trying to poison him; that Aronson and Dr. Almquist had been sent to the penitentiary and that Mrs. Aronson had told him so; that the people at the hospital at Storm Lake were stripping the flesh from skeletons of patients in the hospital and that they would do that to him in case he did not get out; that the doctor and the nurse tried to poison him; that the nurse had been put in the "pen" and the doctor should be put there, too. The record is replete with evidence that Olson told many persons such things —all delusions, and having no basis of fact. Many of these lay witnesses gave it as their opinion that at the time of the deed and bill of sale, before and after, Olson was a person of unsound mind.

In addition to the medical testimony of Dr. Schultz and Dr. Swallum appellants offered the testimony of Dr. Charles F. Obermann, Superintendent of the State Hospital for Insane at Cherokee, Iowa. Dr. Obermann had never seen Olson. In response to a hypothetical question, based largely upon the conduct of Olson during the last few years of his life, witness gave it as his opinion that Olson was mentally incompetent from and after the time he went to the Fort Dodge Hospital early in 1940. At the time Dr. Obermann testified he had before him the hospital record made under the direction of Dr. Schultz. The record shows that Dr. Obermann had specialized in mental diseases, is a member of the American Medical Association and of the American Psychiatric Association. Speaking of the medical record of Olson, the witness said:

"Delusions of persecution, or persecution delusions, are false ideas; that is what we mean by delusions—of individuals working against; doing harm; or in this particular case, such as placing poison in his food; the idea he would have the meat cut from his bones if he wasn't removed from the hospital. I have in my notes here the idea of the man who had the power of attorney, the banker, appropriating or stealing his property; according to the questions you asked me, he thought that the relatives with whom he made his home—or one of the relatives

at least, was in jail because of taking his property; the idea of the doctor while he was at the Lutheran Home in Nebraska putting poison in his medicine—are all evidence of delusions of persecution or paranoid delusions. Such delusions are common accompaniments of cerebral arteriosclerosis of persons of advanced years.''

While the cross-examination of this witness was extensive and covered a wide range, still the witness adhered to his opinion that August Olson at the time he made the deed and bill of sale was a person of unsound mind, although at times he might have periods when he might appear and act rationally.

On the other hand, appellees introduced evidence which they argue established their claim that Olson was mentally competent to make the transfers in question. I will not enter into a detailed analysis thereof but will content myself with saying that few of their witnesses were in a position to speak from extended contacts or observations. Some such witnesses were merely casual and little more than chance acquaintances; very few of them had any dealings with Olson and paid little attention to him or observed his demeanor to any considerable extent. I call particular attention to the testimony of Ida Thorson, mother of Regina Pierson and offered by appellees. She and her husband ran an eating house in Albert City for many years and Olson had taken his meals there. She moved to Storm Lake about ten years before the trial. As a witness she said:

''We [Regina and witness] didn't see him after we moved over here * * * until he was in Swallum's Hospital.''

Witness visited Olson occasionally at the hospital and he visited at her home occasionally later. She gave it as her opinion that Olson was normal mentally. I quote a few of her statements:

''Oh, he'd tell about that he was mistreated. He told me once that he stayed with the Blombergs' son and the Blombergs' son got mad at him and he throwed him out and all his things, he told me that.''

I quote from her testimony regarding Kindwall:

"Q. Did he ever tell you that Kindwall was stealing his money? * * * A. Yes. Well, he didn't say [he] stole it. He said this way, Kindwall won't tell him anything; he won't tell him where the money goes to. Q. Well, you first said to my question: Did he ever say that Kindwall stole some of his money? you said, 'Yes.' What is the fact about that? A. Well, I don't know how to say that because when he said—now, I won't swear to that Kindwall stole his money but he said 'got rid of the money' and they wouldn't tell him what they done with it. He said Kindwall got rid of his money and wouldn't tell him what he did with it. He did not say anything about Dr. Schultz at Fort Dodge."

The evidence showed that Kindwall, as his agent, managed Olson's property efficiently and advised with him therein and kept him posted as to his notes and money in Kindwall's bank.

Guardianship reports show that during the years 1941 and 1942 Olson had medical care; that Olson was in the hospital twice during that time and had medical services rendered him during said period by three different physicians. All these services were performed after January 25, 1941. It is somewhat significant that appellees did not call any of the three different physicians who treated August Olson to testify as to his mental condition at the time they treated him. The only medical witness called by appellees was Dr. A. G. Gran, of Storm Lake, Iowa. This witness testified that the subject of neurology was the basis of his practice largely, that the Psychiatric Association classified him as a psychiatrist; that he devoted his time quite largely to the treatment of mental cases. This witness had never seen Olson. Answering a hypothetical question, which assumed certain activities of August Olson covering a considerable portion of his life, witness testified that in his opinion August Olson, on January 25, 1941, was mentally competent to execute the deed and bill of sale. A study of the entire testimony of this witness is not at all convincing; many of his answers were vague, evasive, and point in the direction of lack of understanding of the matter involved. He made claims of being a specialist and of treating mental cases which had been referred to him by other physicians. I quote from his cross-examination:

"Q. When did any physician ever refer to you a patient of his as a specialist in nervous or mental disorders? A. [no answer.] Mr. Swenson: Let the record show that the witness apparently does not wish to answer, or do you, Doctor? A. You're trying to pin me down that these cases have been definitely psychiatric. I wouldn't say that any doctor sends—Q. Do you care to answer my question or don't you? A. Not as you ask it."

There are other matters in the record which reflect upon the standing and credibility of this witness.

Various witnesses for appellees testified that following the transfers on January 25, 1941, Olson made statements to the effect that he had transferred his property the way he wanted to and was satisfied. Some of these witnesses were of the opinion that he was of sound mind and that at various times when they saw him he acted rationally. However, there is nothing in the record to show that for months prior to January 25, 1941, and thereafter, Olson ever transacted any business.

In argument appellees state that there is nothing in the record to indicate that Olson suffered delusions in 1941, 1942, and 1943, and further state that from any delusions which he may have possessed in 1940 there had been a complete recovery. Evi - dently the trial court took this view of the matter concerning delusions of 1940. I have gone over the record with care and find that the claim of appellees that during the years of 1941, 1942, and 1943 Olson was devoid of delusions is not well founded. Sometime after Regina Pierson was appointed Olson's guardian, Olson told an old friend and former employer (I quote):

"He [Olson] told me he had released Kindwall and turned it over to Regina Pierson to take care of it for him because Kindwall had stolen a thousand dollars."

The same witness told that in February 1943, he met Olson on the streets of Albert City; that maybe Olson knew witness and maybe he did not; that Olson "* * * stood and looked at us. He didn't speak nor he didn't talk and he appeared as though he didn't know where he was going." Henningson said that he went home with Olson; Olson did not talk; he was feeble and "he seemed as though he didn't know where he was going or

anything.'' Olson had worked for Henningson on a 'farm as late as 1933. They first became acquainted in 1926. Witness said Olson told him that his relatives were to get his property: '' 'You know I have brothers and sisters in Sweden also.' ''

Witness Carl Anderson testified that after the guardian was appointed Olson told him that Mrs. Aronson was poisoning him; also that during the spring of 1941 Olson told witness that Kindwall had stolen his money.

Mrs. Carl Anderson testified that Olson kept coming to her home complaining that Mrs. Aronson was poisoning him; also that during the last two or three years of his life every time he came to her home ''he had some complaint about people getting away with his money.'' Likewise, there is in the record evidence that on the very day the guardian was appointed and while Olson was staying at the Aronson home he stated to Mrs. Aronson that he did not want any breakfast prepared by her because ''nobody can eat when you are trying to poison me.''

Olson stayed at the home of Lillian and Roy Schultz from June until September 1941. Both of these persons were witnesses and both testified that Olson was then and at all times thereafter a person of unsound mind; that his actions and talk were irrational; that he kept talking about people trying to poison him or to get his money; that at the table he would throw up his food and then proceed to eat it again, saying that '' 'it's just as good the second time.' ''

Lillian Schultz testified that Olson came to their farm home in March 1941, when they were shelling corn; that he came there with Bart Benna, a son of Edith Benna, one of the grantees in the deed of January 1941; that Olson told Lillian he did not own any property any more; that Regina Pierson had made him sign a paper and that she (Regina) told him he had no property and was broke. Witness said Olson told her that he was told that if he did not sign the paper he could not have anything to eat. I find other matters in the record from which it could be inferred that Olson had delusions as to being poisoned and having his property taken away following the transfers in January 1941. The evidence is that following 1939 Olson progressively became worse, both physically and mentally.

In view of the definite finding of the trial court that the

appellees had shown that Olson was mentally competent to make the deed and bill of sale on January 25, 1941, I will try to analyze the situation as it then stood. Olson requested Aronson to take him to Storm Lake in order to have Regina Pierson appointed as his guardian; he came to that place with Aronson and Carl Anderson; he said nothing about anything but a guardianship; they went to Regina Pierson's office in the courthouse and there all of the discussion was about a guardianship. This done, Olson was next seen at Turner's office in a building apart from the courthouse. Turner's stenographer, Verlee Smith, was at the office; she said that when Olson came Turner was not in but came later. Turner testified that he went to the office with Olson. Olson was a stranger to Miss Smith. She testified:

"When August Olson came to the office Mr. Turner was not in and Mr. Olson talked to me. Mr. Olson said he wanted to see Mr. Turner about making a will; and Mr. Olson stated that he wanted to leave his money and his land to Regina Pierson."

She says that later she prepared the deed and bill of sale at the direction of Turner. She says this was the only time Olson was at the office while she was there. Notwithstanding Miss Smith had seen Olson but once, she gave an opinion that he was of sound mind. Turner testified as to the meeting in the courthouse and then of the incidents in his office.

I have already stated that the relationship of attorney and client then existed between Turner and Olson. While in the courthouse, Olson said nothing to anyone to indicate that he knew or understood the nature and extent of his property. He told Miss Smith that he intended to make a will: no word about a deed or bill of sale.

It seems to me that the evidence offered by appellees falls short of showing that on January 25, 1941, Olson had sufficient mental capacity to understand the nature and extent of his property, the nature and effect of the transaction upon the natural objects of his bounty, and the nature of the claims of those who were excluded from any participation therein.

In connection with appellees' claim that no mental incompetence appeared to various witnesses, I call attention to the lan-

guage of the court in Philpott v. Jones, 164 Iowa 730, 736, 146 N. W. 859, 861. I quote:

"Mental unsoundness may exist which would render a man incompetent to make a will, notwithstanding to all outward appearances he seems to be sane to those with whom he comes in casual contact, who are not experts upon the question."

A leading case upon this matter is that of Bever v. Spangler, 93 Iowa 576, 598, 61 N. W. 1072, 1078. Bever, the testator, was a prominent businessman in Cedar Rapids. His will was attacked on the ground of mental unsoundness. The jury found that Bever was a person of unsound mind and this court sustained the finding: this in the face of a large number of persons who had contact with the testator in a business and social way and who testified that they saw nothing abnormal about him and thought he was of sound mind. This court, in considering this matter, stated:

"That the testator did conduct his private business matters with apparent judgment and sagacity; that he made leases and trades requiring the exercise of discretion; that he seemed to have a memory of past business events, and that to many of his business and social friends he gave no evidence of mental weakness,—cannot be denied. It is also conceded that he wrote the will with his own hand, which is a matter of no little importance."

In that case there was some discussion as to the force and effect of expert medical testimony. Therein the court used the following language, at page 606 of 93 Iowa, page 1081 of 61 N. W.:

"There are cases where expert testimony is of great value, and we are not prepared to say that this is not one of them. The books introduced in evidence establish that it is exceedingly difficult, if not impossible, for an ordinary, unprofessional witness to distinguish between symptoms indicative of the natural decline incident to old age and symptoms strongly suggesting the disease of senile dementia. On questions of this kind we must rely upon the judgment and opinions of experts, who are

able to make proper distinctions, and to furnish us the rules by which we may differentiate the one case from the other.''

Herein is the positive testimony of at least two medical experts who treated Olson. Dr. Schultz diagnosed his ailment as cerebral arteriosclerosis and senile dementia. The experts agree that senile dementia is a gradual breaking down of the brain tissues; that it is progressive and there is no recovery from it. The opinions of these experts stand uncontradicted.

Following a thorough study of the record I am of the opinion that appellees have failed to show that Olson had so far recovered his mental capacity on January 25, 1941, as to be able to execute the bill of sale in question.

I would reverse on both propositions.

WENNERSTRUM, J., joins in dissent.