EMILIE ZUERCHER, appellee, v. GRACE E. ZUERCHER, appellant.

No. 48511.

(Reported in 65 N.W.2d 452)

JULY 26, 1954.

Hyland & Hyland, of Tama, for appellant.

Roy L. Pell and Joe B. Tye, both of Marshalltown, for appellee.

OLIVER, J.—Fred W. Zuercher died intestate, without issue, at Marshalltown, November 5, 1952. He was survived by his widow, defendant Grace E. Zuercher, and by his mother, plaintiff Emilie Zuercher. Under the statutes of descent and distribution his widow, defendant Grace, was entitled to the first $15,000 in value of his net estate and one half the remainder. His mother, plaintiff Emilie, was entitled to the other half of the remainder. Sections 636.32 and 636.41, Code of Iowa, 1954. November 10, 1952, defendant secured from plaintiff a deed and assignment which transferred to defendant all plaintiff's right, title and interest in and to certain described real estate and in and to all personal property in decedent's estate. Shortly thereafter plaintiff brought this suit alleging defendant had obtained the execution of the instrument by actual and construc-

tive fraud, and praying its cancellation. Trial resulted in judgment canceling the instrument, and this appeal by defendant.

Upon the death of Fred Zuercher, defendant Grace Zuercher had consulted with her attorney about Fred's estate and learned how the statutes would distribute it. She telephoned her brother, Lester H. Flower, a securities salesman in Des Moines, who came to Marshalltown, November 10, and took charge of the matter. He directed the attorney to apply for the appointment of defendant as administratrix of Fred's estáte. Early that afternoon they secured her appointment and she qualified. Under Mr. Flower's instructions the attorney prepared also Exhibit A, the deed and assignment here involved, for execution by plaintiff. The consideration stated was "one dollar and other considerations." Fred's estate was worth about $40,000 and the value of the plaintiff's share from $7000 to $10,000.

At five o'clock that afternoon Mr. Flower, defendant Grace and the attorney made an unannounced call at the home of Mark and Pauline Glasgow, daughter and son-in-law of plaintiff Emilie Zuercher, with whom plaintiff lived. Their purpose was to secure plaintiff's signature to Exhibit A. It is not contended that matter had been previously mentioned to or considered by her.

Plaintiff was eighty years old. As a young woman she had come to the United States from Switzerland and had reared a family of five children. She 'had no business experience and after the death of her husband in 1951 her sons' had cared for such matters for her. Her property and income consisted of a railroad pension of $37.39 per month and payments to her on the family home which had been sold under contract. She was recovering from a broken hip and occupied a wheel chair. Her hearing was defective and the hearing aid used by her was then undergoing repair.

When the securities salesman, the attorney and defendant Grace descended upon the Glasgow home they found plaintiff Emilie sitting in the front room. The Glasgows were at home. Defendant Grace announced she had been appointed administratrix of her husband's estate. One witness testified she exhibited the letters of administration. According to Mr. Flower, defendant then stood beside plaintiff, held Exhibit A out in

front of her and said, " 'Will you sign this quitclaim deed? It is the same kind of a quitclaim deed that Fred and I signed for the August Zuercher property.' " Flower testified he then said, "I will read the quitclaim deed" and he took it from defendant and read it to plaintiff "loud enough so that she could hear it." She asked no question about it. "After I read it to her, I asked her if she would sign the quitclaim deed, if she wanted Grace to have this property, if she understood it and she shook her head and said she did, 'yes'. * * * Mark Glasgow asked to see the document when we arrived there, but he couldn't find his glasses and I told him I would read it to him. * * *

"Before I took the paper out of Grace's hands, Mark [Glasgow] made the statement to Emilie Zuercher that she shouldn't sign the paper until the other children were contacted about it. * * *

"No one said to Mrs. Zuercher what the property was that she might be entitled to as surviving mother of Fred Zuercher on that day.

"No one said to her what particular property we wanted her to quitclaim to her * * * and no one said in dollars or cents [what] her interest in the Fred Zuercher estate might be, nor how much the value was in real estate for the whole property, nor how much in stocks or bonds or bank accounts. No one said anything to her that she was giving away absolutely all her interest in Fred's estate by signing this document, and no one said you are entitled to private, competent, legal advice before you sign the paper, nor that she was entitled to consult any lawyer of her own choice about it, and away from and not in the presence of Grace Zuercher before she signed this. * * *

"I am the one who laid it out on a magazine in her lap just before she signed it. * * * I had the pen in my hand. * * * I am the one who took the paper and put it in my pocket after she signed." (It will be noted plaintiff did not have the opportunity to inspect the instrument either before or after she signed it.) After plaintiff signed, the lawyer said, "Now, Grace, give her a dollar" (which Grace proceeded to do "to make it legal"). "Up to that time, no word had been spoken to the plaintiff as to any consideration she should be entitled to if she signed the deed."

The foregoing account of the securing of plaintiff's signature was taken from the testimony of the securities salesman Flower, the principal actor and star witness for defendant. The only word Flower testified plaintiff uttered during the time they were soliciting her signature to the conveyance was " 'yes'. "

Defendant, although present in court, did not testify. We are told this was because of a mental ailment. The attorney, the only other witness for defendant, relative to the procuring of plaintiff's signature, did not remember anything plaintiff "said about whether she wanted to sign this deed or didn't want to sign it. * * * I don't recall Emilie Zuercher saying anything to Lester Flower." The attorney testified that after she signed he took her acknowledgment and explained the instrument to her. "I wanted to know if she had some idea of what she signed. It is my recollection that all she did was nod her head at that time."

Mark Glasgow testified for plaintiff:

"Mr. Flower just had the paper in his hand and his pen in the other hand. He said, 'Sign this paper. We want you to sign your name. We want you to sign your name Emilie Zuercher instead of Mrs. Zuercher.' I would say I heard Lester Flower say four times, to her in substance, he wanted her to sign this paper. I told Mrs. Zuercher, 'Don't sign your name to that paper until I get my glasses so that I can read it.' Grace said to me, 'You keep out of this, it is none of your affairs whatever.' Grace got up and walked over to Mrs. Zuercher and said, 'You sign for me, I signed for you.' Lester Flower had the paper that time. Lester Flower said, 'We're in a hurry', said it to me and said it to Mother. * * *

"When I came back into the room and saw she had signed her name on the paper I said to Mother Zuercher, 'What did you do?' She said, 'I had to sign'. She said Lester Flower told her she had to sign it. They left in about 30 seconds * * *."

Mark testified when plaintiff said, " 'I had to sign' " he put his hand on her shoulder and her body was trembling. "She looked and appeared to be scared. * * * She was scared of Lester Flower."

Pauline Glasgow gave similar testimony and testified that during the visit of defendant, the lawyer and Flower, her mother did not have anything to say, and just sat there and appeared to be shocked and tired—trembled.

Plaintiff testified:

"On November 10th, I didn't feel good. It was awful times in my head that come up. I was kind of dizzy back in the head. I remember them coming down that day and without my hearing aid I could not hear too good, it was kind of dizzy in my ears. On November 10, 1952, nobody told me anything that day what they wanted there. * * *

"I didn't hear anything just kind of mumbling. * * * He [Flower] didn't read much, I didn't hear what he read, anything. * * * The signing was pushed on me. * * * Lester Flower made me do it. 'You sign that'; he told me. I didn't know what I was signing. * * * I was so confused in my head I didn't know what I was going to do. * * * That was pushed onto me, that signing. * * * Just made me do it, where to sign that paper."

██ A transfer, by the beneficiary to the fiduciary, of trust property is presumptively fraudulent, and, when its validity is assailed, the burden is upon the fiduciary to rebut the presumption of overreaching on his part and to affirmatively establish that, in his acquisition of the property, he took no advantage of the beneficiary by reason of their relationship, but that the beneficiary acted voluntarily, with freedom, intelligence and a full knowledge of all the facts. Merritt v. Easterly, 226 Iowa 514, 284 N.W. 397, and citations; Curtis v. Armagast, 158 Iowa 507, 526, 138 N.W. 873, 880; Marron v. Bowen, 235 Iowa 108, 16 N.W.2d 14; Restatement of the Law, Restitution, section 191. To overcome this presumption the proof must be clear, satisfactory and convincing. Laufert v. Wegner, 245 Iowa 472, 473, 62 N.W.2d 758, 759, and citations; Daniels v. Fackler, 244 Iowa 1163, 1165, 58 N.W.2d 309, 311.

██ At the time plaintiff's signature to Exhibit A was secured Grace was administratrix of the estate of Fred Zuercher and the record indicates she was in actual possession of the real estate. It is clear she had the status of a trustee for the benefit

of persons interested in the estate. Goodman v. Bauer, 225 Iowa 1086, 1090, 281 N.W. 448. Bettendorf v. Bettendorf, 190 Iowa 83, 109, 179 N.W. 444, 456, states:

"An executor or administrator, in dealing with the estate and with those interested therein, is regarded as a trustee, and, as such, is subject to the principle which raises a presumption of fraud against him when he undertakes to purchase the trust property from his cestui que trust."

In the language of Milroy v. Milroy, 190 Iowa 1215, 1219, 181 N.W. 473, 475: "Manifestly, it was the duty of the defendant, who was the administrator of the estate of Peter Milroy, before taking an assignment of the interest of plaintiff therein, to fully and fairly disclose the facts to him."

▆ It is contended defendant's appointment and qualification as administratrix, only a few hours before the execution of Exhibit A by plaintiff, was so recent that the actual relationship of fiduciary and beneficiary, as to matters within the scope of the relation, had not commenced. The record furnishes no factual background for this argument. It shows defendant had consulted with the attorney about Fred's estate some days prior to November 10. She told him about the estate and apparently that her husband left no will. He advised her how the estate would be divided between her and Emilie. She consulted with him again on November 10. Flower testified that when the trio called upon plaintiff he told her defendant had been appointed administratrix "and that we were anxious to settle up things pertaining to the estate."

This would indicate defendant had then taken over the estate and the administration was proceeding actively.

Olsson v. Pierson, 237 Iowa 1342, 25 N.W.2d 357, is cited by defendant. In that case the fiduciary did not plan or solicit the conveyance, did not even know of it until later; the grantor had independent legal advice and knowingly gave the property to the fiduciary, apparently in consideration of the same friendship that prompted his voluntary selection of her as his guardian and not because of the fiduciary relationship which had not actually commenced. Because of these and other factual differences the cited case is not here in point.

1112

■ We agree with the conclusion of the trial court that defendant failed to overcome the presumption of fraud and establish the validity of the transaction. In fact, the record shows plaintiff was overreached.

Plaintiff's husband had willed plaintiff a life estate in the house in which she and he had lived, remainder to their five children. After his death their five children gave plaintiff their interest in the house and their spouses joined in the deed to her. The house was sold on contract and the payments together with a monthly pension of $37.39 furnished plaintiff's support. Apparently, defendant erroneously assumed that transaction obliged plaintiff to give defendant plaintiff's share in the estate of defendant's husband.

Without consulting with or informing plaintiff, defendant and Flower had the attorney draft Exhibit A for plaintiff's signature. Then the three suddenly appeared at plaintiff's abode. Defendant and Flower brushed off suggestions for delay with the pretext of urgency and by their insistence coerced this handicapped old lady to sign Exhibit A, without telling her what she was giving away or giving her an opportunity to consider the matter or secure independent legal advice. Equity will not approve such a transaction.—Affirmed.

All Justices concur.