## WARNER *v.* KERR.

1. DEEDS—MENTAL COMPETENCY—EVIDENCE—SUFFICIENCY.
   In a suit by the daughter to set aside a deed by the father of a farm to the son, evidence *held*, sufficient to support the finding of the court below that grantor was mentally competent to make it.

2. SAME—UNDUE INFLUENCE—MERE OPPORTUNITY INSUFFICIENT.
   Undue influence in the execution of a deed may not be established by mere opportunity.

3. SAME—EVIDENCE—SUFFICIENCY.
   Evidence *held*, insufficient to show that the execution of the deed was procured by undue influence.

4. Witnesses—Attorney and Client—Privilege—Application of Rule.

> In suit by the daughter to set aside a deed by the father of a farm to the son, both parties claiming under the client, and neither being a stranger to the estate, the rule of privilege between attorney and client has no application, so that testimony by the attorney who drew the deed and another who had desk room in his office, as to the conversation between the attorney and the father at the time the deed was drafted, was admissible.

Appeal from Calhoun; North (Walter H.), J. Submitted June 10, 1921. (Docket No. 39.) Decided October 7, 1921.

Bill by Mary Warner against John Henry Kerr and another to set aside a deed on the ground of undue influence and mental incompetency. From a decree dismissing the bill, plaintiff appeals. Affirmed.

*Henry F. Jacobs* and *Howard W. Cavanagh,* for plaintiff.

*James M. Powers,* for defendants.

BIRD, J. This is a contest between brother and sister over the estate left by their father. John Kerr, the father, was the owner of a farm of 140 acres in the vicinity of Battle Creek for many years. He was a successful farmer and at the time of his decease, in May, 1918, his farm was worth about $16,000, and his other property was worth upwards of $10,000. He had two children, Mary, the plaintiff, and John Henry Kerr, one of the defendants.

In May, 1915, the father made a will giving John Henry Kerr a life estate in the farm with the remainder to his children. To Mary he gave a life use of all the rest of his property, with remainder to her children, with a provision that in the event she

had no children the remainder was to go to the children of John Henry.    In November, 1917, he conveyed by warranty deed to John Henry Kerr the farm, reserving therein a life estate to himself.    After his death, John Henry Kerr filed the will for probate. Mary Warner, the plaintiff, appeared and objected to its allowance.    The will was finally denied probate on the ground that it was not executed in accordance with the statute.    An administrator was then appointed to administer the estate.    Soon after, this bill was filed by plaintiff to set aside the deed of the farm on the ground that her father was unduly influenced by her brother to execute the deed and upon the further ground that he was not mentally competent to make it.

1. Was John Kerr mentally incompetent in November, 1917?    Plaintiff's contention that her father was incompetent is based upon certain proofs made by her that in May, 1917, he suffered a stroke of paralysis which materially affected his left side and his mind. Proof was admitted tending to show that after this so-called stroke the left side of his face was drawn and his gait was unsteady, that he had dizzy spells and at times he would cry, that he was forgetful, that his speech was affected and that his mind was impaired, it being difficult for him to understand what was said to him, and also difficult to make himself understood.    In short, that after the stroke there was such a weakening of both body and mind that he did not have the mental capacity to execute the deed in question.    Upon this proof expert medical testimony was taken tending to show that he was mentally incompetent at the time the deed was executed.

On the other hand it was denied that he had suffered a stroke of paralysis.    It was shown that he had a short sick spell in May, 1917, and that it was caused

by stomach trouble. It was shown that after this sick spell he went about as usual, and many witnesses and friends who had known him for many years and lived as neighbors and who had seen him often, testified that they saw no material change in his mental or physical condition after his sick spell. After the sick spell, in the summer of 1917, he went from Battle Creek to the farm as usual, and it was shown that he had shoveled and hauled gravel, that he assisted in laying a cement feeding floor for the hogs, that he drove a mowing machine, hay rake and the wagon while loading hay, that he stacked the grain, making three large stacks about 20 feet high, that he assisted in taking out the wooden floor from the cow barn and substituting a cement one, that he assisted in cleaning wheat and taking it to market, that he sowed clover seed and assisted in threshing the grain, besides doing much other work. In addition to this, he was appointed a trustee to disburse a fund raised to help in rebuilding a neighbor's house that had been destroyed by a cyclone. In this capacity he disbursed about $900 in various sums. Besides this, he negotiated a lease and the terms of sale of his farm to the United States Government. The farm was on the edge of Camp Custer. When Camp Custer was enlarged, Mr. Kerr's farm was taken in and made a part of it. Mr. Kerr regretted this. He consulted two lawyers to see if he could avoid letting the government have it. When he learned resistance was useless he gave up and made the best bargain he could. The negotiations were carried on by him. If Mr. Kerr could, and did, do these things after his so-called stroke, it is evident he was not in the precarious condition which some of the witnesses for plaintiff attempted to picture him. Dr. Gething, who was in attendance after he had the so-called stroke,

would not say upon the witness stand that he had had a stroke of paralysis.   He said Mr. Kerr "had had high blood pressure, *arterio sclerosis*," but he did not think this had anything to do with that particular sickness.   He called at his house only once when he had this sick spell and he then prescribed for him for gastric ulcers of the stomach.   The testimony bearing on the question of mental competency is very voluminous.   We cannot hope to discuss all of it.   All we can do is to give our conclusions after reading it.   We are very much impressed with Mr. Kerr's physical and mental competency down to his last sickness in 1918. The record shows him to have been a strong, rugged Irishman, a good farmer, and possessing a better knowledge of business generally than the average farmer, and we think the picture of him as made by the record shows him to have had more mental strength down to his last sickness than either one of his children.

But even if we concede that he had weakened in mind and body, as plaintiff says he had, after his sickness, it is not very important as bearing upon his act in deeding his farm to the boy.   In May, 1915, his competency is not questioned.   In that year he made the will and gave the boy a life use of the farm, and to the plaintiff a life use of the balance of his property.   This was a division of his estate in the proportion of about three-fifths to the boy and two-fifths to the daughter.   What he did in 1917 was simply carrying out a part of what he had provided for in his will in 1915.   If he gave the farm to the boy by his will in 1915, when he was concededly competent, what evidence of incompetency was it to deed it to him two years later, reserving a life use of it for himself?   It was the natural thing for him to do to give the farm to the boy.   He was much at-

tached to the farm and wanted to keep it in the family. The boy had been raised on the farm and had remained there and worked the farm on shares for several years, but the record shows that it was the strong hand of the father that controlled it. Had the plaintiff acquiesced in the will when John Henry offered it for probate he would have, undoubtedly, allowed her to have the share her father gave her. It was not the father's fault that only about one-quarter of the estate goes to the daughter. He went to an experienced attorney and had him draw and look after the execution of the will. When the will was offered for probate the attorney was dead and the other witness testified that he did not sign it in Mr. Kerr's presence. For this reason the probate court was obliged to refuse it probate. After the execution of the will in 1915 there was no change made by the father in the share that he wanted each child to have. We are persuaded that John Kerr was mentally competent when he made the deed and the chancellor was right in so holding.

2. Was Mr. Kerr unduly influenced to make the deed to John Henry? Not much time need be taken with this question. If there were any competent evidence offered tending to show that such influence was attempted we are not convinced that it had that effect. There is no proof that his condition, mentally or physically, was such in May, 1915, that he could be unduly influenced. Indeed, there is no proof that he was unduly influenced by any one. In 1917, by a conveyance of the farm to John Henry, he did just what he had provided for in his will in 1915. Both parties had an opportunity to influence their father, but undue influence must be established by something more than mere opportunity. *Severance* v. *Severance,* 90 Mich. 417; *Blackman* v. *Andrews,* 150 Mich. 322.

Mr. Kerr lived in Battle Creek when his wife died in 1914. After her death plaintiff and her husband came to the father's house and lived with him. Mr. Kerr attended to his business matters in the city and went to the farm frequently with his horse and buggy. While the son was working the farm on shares, Mr. Kerr appears to have kept in touch with the management of the farm. He assisted at times in the work and made and superintended repairs. After plaintiff went to live with her father, the children were not cordial to each other. The ill feeling was obviously engendered by a feeling that each was trying to get the advantage of the other in the distribution of the father's property. If any attempt were made along this line, the testimony does not show that it succeeded. Mr. Kerr made a very equitable distribution of his property. He, undoubtedly, died in the belief that he had given the farm to John Henry and the balance of his property to Mary. It was no fault of his that Mary will not get as much as he intended her to have. It is due in part to her own greed and bad management. We are impressed that the conclusions reached by the chancellor on both of the questions involved are the proper ones.

3. Exception was taken to the testimony of Mr. Winkler and Mr. Powers. Mr. Powers was the attorney who drew the deed and Mr. Winkler was an attorney who had desk room in Mr. Powers' office, and by reason of this heard the conversation between Mr. Kerr and Mr. Powers with reference to the drafting of the deed. The testimony given by Mr. Powers was not within the statute. Neither party to the litigation was a stranger to the estate. Both parties were claiming under the client. Under these circumstances the rule of privilege between attorney and

216—Mich.—10.

client does not apply. *In re Loree's Estate*, 158 Mich. 377. The rule is also stated in 40 Cyc. p. 2380.

We are of the opinion that the decree made by the lower court should be affirmed, with costs to the defendants.

STEERE, C. J., and MOORE, WIEST, FELLOWS, STONE, CLARK, and SHARPE, JJ., concurred.