Argued October 12, affirmed December 7, 1955

# BERGSVIK *v.* BERGSVIK
291 P. 2d 724

*B. G. Skulason,* of Portland, and *John Wilkinson,* of Vancouver, Washington, argued the cause and filed a brief for appellant.

*Leonard D. Alley,* of Portland, argued the cause for respondents. With him on the brief was John D. Williams, of Portland.

Before WARNER, Chief Justice, and TOOZE, LATOURETTE and PERRY, Justices.

TOOZE, J.

This is an appeal from a decree of the circuit court of Multnomah county which was entered in a suit brought by Lars R. Bergsvik, Jr., as plaintiff, against Loyalty Bergsvik, as devisee, and the Portland Trust Bank, administrator with will annexed of the estate of Sarah W. Bergsvik, deceased, as defendants. The complaint asked that the order admitting the last will and testament of Mrs. Bergsvik to probate be set aside, and that the will, so far as it conflicts with a "Community Property Agreement" entered into between the testatrix and her husband, be held for naught, and that, according to the terms of this agreement, the defendant, Loyalty Bergsvik, be required to execute a conveyance to the plaintiff of an undivided one-half interest in certain realty, or upon his failure to do so, that the decree as prayed for shall operate as such in lieu thereof. From a decree denying the relief sought and dismissing the suit, plaintiff appeals.

On and prior to May 27, 1942, Lars Bergsvik, Sr., and Sarah W. Bergsvik were husband and wife and domiciled in Portland, Oregon. On that date they executed and acknowledged what is entitled a "Community Property Agreement", the complete text of which is as follows:

### "COMMUNITY PROPERTY AGREEMENT

"WHEREAS, LARS BERGSVIK and SARAH W. BERGSVIK, the undersigned, are husband and wife, and are the father and mother of Loyalty Bergsvik and Lars R. Bergsvik, Jr., who are their heirs at law and sole heirs at law; and,

"WHEREAS, Lars Bergsvik and Sarah W. Bergsvik are the owners of certain real property and personal property in Pacific County Washington, which was acquired during their marriage, is community property, and consists of the following:

"(a) Certain real property consisting of pipeline right-of-way of Chinook Water Works, fully described in deed recorded in Volume 80, page 54, Deed Records of Pacific County, Washington.

"(b) The home of Lars Bergsvik and Sarah W. Bergsvik in the town of Chinook, Washington, fully described in deed recorded in Book 102, page 426, Deed Records of Pacific County, Washington, together with the furniture and furnishings therein; also the real property described in deed recorded in Volume 81, page 411, Deed Records of Pacific County, Washington.

"(c) All personal property belonging to Chinook Water Works, consisting of pipeline equipment, accounts receivable, State and county franchises, water rights and Good Will.

"And, WHEREAS, the undersigned are desirous that said property and any other property which they may hereafter acquire shall pass without delay or expense, in case of the death of either of the parties, to the survivor, *each having faith in the other that the survivor will make adequate provision in the event of his or her death to bequeath and devise said property to their sons,* Loyalty Bergsvik and Lars R. Bergsvik, Jr., above named, *in equal proportions;*

"NOW THEREFORE, in consideration of the love and affection that each of the parties hereto has for the other, it is hereby agreed that in case of the death of the said Sarah W. Bergsvik while the said Lars Bergsvik survives, the whole of said property above described, together with any and all other property by them hereafter acquired in the

State of Washington, shall at once vest in Lars Bergsvik in fee simple. In the event of the death of the said Lars Bergsvik leaving the said Sarah W. Bergsvik surviving him, the whole of said property above described, together with all other property hereafter acquired in the State of Washington, shall at once vest in Sarah W. Bergsvik in fee simple, and we hereby certify and declare this agreement shall not and will not in any way derogate the rights of any creditors, but is entered into solely for the purpose of transferring all our property to the survivor in the event of the death of either, without delay or expense.

"IN WITNESS WHEREOF, we, the parties to this agreement, have hereunto set our hands and seals this 27th day of May, 1942.

> "[Sgd.] Lars Bergsvik
> [Sgd.] Sarah W. Bergsvik

"Executed in Presence of:
 [Sgd.] Kathleen L. Williams
 [Sgd.] John D. Williams

 "STATE OF OREGON ) ss.
 COUNTY OF MULTNOMAH )

 "I, JOHN D. WILLIAMS, a Notary Public in and for said State, do hereby certify that on this 27th day of May, 1942, personally appeared before me LARS BERGSVIK and SARAH W. BERGSVIK, to me known to be the individuals described in and who executed the within instrument, and acknowledged that they signed and sealed the same as their free and voluntary act and deed, for the uses and purposes therein mentioned.

 "IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

 "[Sgd.] John D. Williams
"[Notarial Notary Public for the State of Oregon,
 Seal] residing at Portland, in said County.
 My commission expires March 17, 1945."
 (Italics ours.)

Lars Bergsvik, Sr., died intestate on August 6, 1942, and at that time he and his wife presumably owned all the property involved in this suit, the water works, a home, and a vacant lot, all located in the state of Washington, and the family home located in Portland, Oregon. The evidence does not disclose with certainty how the titles to these Washington properties were vested. The home in Portland belonged to Sarah Bergsvik, and title thereto was in her name only. There is in evidence an assumed business name certificate filed in the superior court for Pacific county, Washington, on November 12, 1941, stating that Sarah W. Bergsvik and Lars Bergsvik were the proprietors of the Chinook water works. Also there is testimony that the husband and wife purchased the water works property with funds raised by giving a mortgage on the Portland home and by borrowing additional funds secured by a promissory note signed by both of them. It is true that there is in the record a statement by the plaintiff himself that Lars Bergsvik, Sr., was the sole owner of this property; however, there is no further evidence tending to support this conclusion upon his part. As to the state of the title to the other two properties, the house and vacant lot in Chinook, at the time the agreement was entered, the record is silent.

However, irrespective of the true condition of the titles, upon the death of Mr. Bergsvik, Sarah Bergsvik took possession of all this property pursuant to the agreement above mentioned and, with some aid from her sons, operated the water works until her death on March 7, 1952.

At her death she left a will appointing Loyalty Bergsvik, the defendant, executor, and this will was presented for and admitted to probate in the circuit

court for Multnomah county, Oregon, probate department. Ancillary proceedings were also instituted in Pacific county, Washington.

The material portions of the will are as follows:

"THIRD

"" * * * * *

"I also give, devise and bequeath to my son Loyalty Bergsvik, the following described real and personal property:

"(a) All of the Chinook Water Works, which includes certain real property consisting of pipeline, right-of-way of Chinook Water Works, reservoir site, fully described in deed recorded in Volume 80, page 54, Deed Records of Pacific County, Washington. All other property, real or personal, belonging to Chinook Water Works, consisting of pipeline equipment, accounts receivable, State and County Franchises, water rights and Good Will;

"(b) My home in the Town of Chinook, Washington, fully described in deed recorded in Book 102, page 426, Deed Records of Pacific County, Washington, together with the furniture and furnishings therein;

"(c) Also all other real property I may own in Chinook, Washington, except one corner lot 50 x 200 feet, in Tract 105, Town of Chinook, Pacific County, Washington.

"The bequest and devise of the Chinook Water Works to my son, Loyalty Bergsvik, shall not become effective unless prior to the closing of my estate he make, execute and deliver or tender to my son, Lars R. Bergsvik, his unsecured installment promissory note in the amount of Six Thousand Dollars ($6,000), payable in monthly installments of not less than Forty ($40.00) per month, said note to bear no interest and shall provide that

the first monthly payment of $40.00 be made by my son, Loyalty Bergsvik, to my son, Lars R. Bergsvik, within thirty (30) days following the closing of my estate, with like payments of $40.00 per month each month thereafter.

"In the event of the death of my son, Lars R. Bergsvik, at any time before the said $6,000 promissory note is paid, said note shall be cancelled and not become an asset of the estate of my son Lars R. Bergsvik.

"In the event my son, Loyalty Bergsvik, does not give said promissory note for $6,000 to my son, Lars R. Bergsvik, the Chinook Water Works shall then become a part of the residue of my estate and be distributed under the provisions of the residuary paragraph, being Paragraph Fifth hereof.

### "FOURTH

"* * * * *

"I also give and devise to my son Lars R. Bergsvik my home in Portland, Oregon, described as follows: Lot Three (3), Block Four (4) KEYSTONE ADDITION to the City of Portland, Multnomah County, Oregon; also one corner lot, 50 x 200 feet, in Tract 105, Town of Chinook, Pacific County, Washington."

The residue of her property she gave to the two sons equally.

It is plaintiff's contention that in making her will as she did, his mother violated the community property agreement which he says obligated her to devise the property owned by her at her death to him and his brother in equal proportions. Therefore, the primary question presented by this appeal is the effect to be given to the words in this agreement which we have italicized, but in deciding this question certain other collateral problems are raised which must first be answered.

■ At the outset it might be well to more fully explore the theory upon which plaintiff proceeds in this suit. As pointed out above, the complaint in effect asks that this community property agreement be enforced, and that the devisee be required to do what his mother allegedly failed to do; that is, make an equal distribution of the properties she devised by her will. *Such a demand necessarily presupposes the validity of the so-called community property agreement and concedes its efficacy to vest title to all the property in her as the survivor at the death of her husband.* This conclusion is required because, if the agreement was invalid, she would not have title to the property and could not carry out the very obligations which the plaintiff contends were placed upon her by the agreement. Having taken this position initially and proceeded throughout the trial with it unchanged, it is not permissible for him now to change his theory in this court and assert, as he does in his reply brief and oral argument, that the agreement is, under Washington law, invalid. *Parker v. Norton,* 143 Or 165, 21 P2d 790; *Stark v. McKenna et al.,* 124 Or 332, 263 P 391; *Obermeier v. Mortgage Co. Holland-America,* 123 Or 469, 259 P 1064, 260 P 1099, 262 P 261.

Presumably the agreement was executed pursuant to the authority of § 6894 of Remington's Revised Statutes of the state of Washington, which reads as follows:

"Agreements as to status of. Nothing contained in any of the provisions of this chapter, or in any law of this state, shall prevent the husband and wife from jointly entering into any agreement concerning the status or disposition of the whole or any portion of the community property, then owned by them or afterward to be acquired, to take effect upon the death of either. But such agree-

ment may be made at any time by the husband and wife by the execution of an instrument in writing under their hands and seals, and to be witnessed, acknowledged, and certified in the same manner as deeds to real estate are required to be, under the laws of the state, and the same may at any time thereafter be altered or amended in the same manner: Provided, however, that such agreements shall not derogate from the rights of creditors, nor be construed to curtail the powers of the superior court to set aside or cancel such agreement for fraud, or under some other recognized head of equity jurisdiction, at the suit of either party. [Cd. '81, § 2416; 1 H.C., § 1401]."

It has now been suggested by plaintiff that, because the parties were domiciled in Oregon, no community in fact existed, and, therefore, this agreement would not be given effect by the courts of Washington. On oral argument we were also informed that the Supreme Court of Washington has never decided the question of whether the benefits of this statute are available to persons domiciled outside the state but who own property within its borders. However, in our view it is not necessary to speculate upon what the Washington court would decide in the matter were this case before it, although we do feel that the Washington cases dealing with agreements of this type, particularly *Bartlett v. Bartlett,* 183 Wash 278, 48 P2d 560, would resolve the matter in defendants' favor should that court also feel constrained to hold that nonresidents owning property in Washington might take advantage of the statute's benefits.

The case is presented to us by the pleadings on the theory that the agreement is valid, for recovery is predicated upon it. The validity and effectiveness of this agreement as a conveyance of title is the sole basis of plaintiff's claim, and he is estopped to deny

that validity and effectiveness at this stage of the proceedings. We must, therefore, assume that title to all the property vested in Mrs. Bergsvik upon the death of her husband, and that she had the ability to perform her obligations under the agreement, if in fact it placed any upon her.

Having so decided, there is but one further question remaining; namely, whether this agreement placed such a burden upon her. If she had this duty, as the plaintiff contends, it must be solely by virtue of the words italicized in the text of the agreement set out above.

 It is now too well established for argument that precatory words such as those chosen by the draftsman of this instrument may, in fact, impose mandatory duties. The words themselves do not connote demand, but rather indicate request only. However, it is recognized that their use may have hidden a very real intention to command compliance, and in fact the early law in England did give this somewhat unnatural construction to them in all cases where a desire only was manifested. *Harding v. Glyn*, 1 Atk 469; *Malim v. Keighley*, 2 Ves Jr 333. Also see 1 Scott, Trusts 153, § 25.1 and cases there cited. The more enlightened cases of later times, however, rebelled against this officiousness of the chancery courts in imposing a trust every time mere words of desire only were used and enunciated what has come to be the rule in this jurisdiction, as well as in most other courts of the nation. The rule as it now stands provides that words denoting request, wish, desire, or the like will be given mandatory effect only when it appears from all the facts and circumstances of the particular case that the party using them intended that they should impose an obligation upon the recipient of the property. *Hall et al. v. Dolph et al. and Watkins et al.*, 184 Or

319, 198 P2d 272; *Cooke v. King,* 154 Or 621, 61 P2d 429, 62 P2d 20; *Wemme v. First Church of Christ, etc.,* 110 Or 179, 219 P 618, 223 P 250; *Beakey v. Knutson,* 90 Or 574, 174 P 1149, 177 P 955; *Knight v. Knight,* 3 Beav 148. The precedents thus become only guides showing what the courts have decided from the particular facts before them in other cases, and each case stands upon the facts it represents which are relevant to the ultimate question of intention. The instrument involved is read as a whole and is placed in its proper relation to all the other facts attending its execution.

■ Applying this rule to the document before us, we are of the opinion that it was not the intention of the parties signing it to impose immutable obligations upon the survivor.

■ The agreement provides that the property is to vest in the survivor in "fee simple", and these words alone are a strong indication of the intention of the person using them. This, of course, is the highest estate known in law and imports absolute ownership in the grantee. It will admit of no qualifications, for to qualify it in length of duration, alienability, or in any other particular, relegates it to the status of some lesser estate. *Chance v. Weston,* 96 Or 390, 190 P 155. The words "fee simple" carry a meaning well known to the law. They are not ambiguous or capable of varied interpretation, and their use signifies an intention upon the part of the grantor to convey a complete title, free of any restrictions or obligations.

An estate in fee simple was neither necessary nor appropriate to carry out the intention which plaintiff would attribute to his parents, and we must conclude that such construction was not in fact intended by them. There were available to the parties several

methods for accomplishing this alleged purpose if they wished. Any of them would have indicated positively their desires, but the attorney who drafted the instrument used these words: "fee simple", words which convey one idea, and the parties accepted them wholeheartedly. To interpret them as expressing a different intention would require us to do violence to established rules of construction.

Plaintiff urges that because Mr. Bergsvik destroyed his will immediately upon the execution of this agreement, we should believe that he intended this agreement to operate as he asks. There is no showing what the provisions of that will were. In such a case the only thing which may be safely concluded from this fact is that he intended that this agreement should operate in lieu of the will. We do not know what testamentary plan was replaced by the agreement, and without that knowledge the fact of destruction of the will sheds no light whatever upon our inquiry here.

If further indication of the real purpose of this agreement is needed, it may be found in the concluding phrase thereto where it is recited that: "* * * [this agreement] is entered *solely* for the purpose of transferring all our property to the survivor in the event of the death of either, without delay or expense." (Italics ours.) It is true that this statement follows another declaring that the agreement shall not derogate the rights of any creditors (in the words of the Washington statute, supra) and the two are joined in such a way that it might be claimed that the one is further elaboration of the other and means nothing more. To say this, however, would require reliance upon an inference drawn merely from the location of the phrases in relation to each other to negate the plain meaning of such a decisive term as "solely". Web-

ster's International Dictionary 2d ed, defines "solely" as follows:

> "Without another; singly; alone * * *.
> "Exclusively; to the exclusion of other purposes, persons, etc.; merely; entirely; wholly * * *."

Hence, it may reasonably be concluded that the parties intended this agreement to have one purpose and no more; i.e., that of immediately transferring title to all their property in *fee simple* to the survivor in the event of the death of one of them.

The record also discloses a conversation had between Mr. Bergsvik and his attorney at the time the agreement was executed. The import of that evidence, as related by the attorney, is that Mr. Bergsvik stated that his wife had taken care of him continually without any help, and that he (Mr. Bergsvik) wanted her to have everything he had. He then inquired as to the best and least expensive way to do it, and the result was the preparation of this agreement by and upon the advice of the attorney.

██ Plaintiff objected to this testimony on the ground that this was a privileged communication between an attorney and his client. This objection was not well taken for two reasons. In the first place this is a privilege given for the benefit of the client (which may be waived by him), and is not available to others. Wigmore states the rule in these terms:

> "But it is as client, *not as party to the cause*, that he is entitled; for the reason of the privilege applies to all clients as such, whether or not they are parties when the disclosure is sought from them. Hence, the privilege equally forbids disclosure by the attorney of a client not in any way concerned in the cause. Conversely, when the client is not a party, then on general principles (ante § 2196) the party cannot invoke the privilege; and, if the

privilege is erroneously refused, the party cannot appeal on the ground of this error." VIII Wigmore on Evidence 626, § 2321.

See also *Baum et ux. v. Denn et al.*, 187 Or 401, 406, 211 P2d 478; 58 Am Jur 291, Witnesses, § 520.

■ Secondly, although the conversations might have been privileged during the lives of the parties, after the death of both of them the privilege is removed. The rule is stated in Corpus Juris in this way:

"It is generally considered that the rule of privilege does not apply in litigation, after the client's death, between parties, all of whom claim under the client; and, so, where the controversy is to determine who shall take by succession the property of a deceased person and both parties claim under him, neither can set up a claim of privilege against the other as regards the communications of deceased with his attorney." 70 CJ 438, Witnesses, § 587.

Also see *Smith v. Smith*, 173 Cal 725, 161 P 495; *Warner v. Kerr*, 216 Mich 139, 184 NW 425; *Boyd v. Kilmer*, 285 Pa 533, 132 A 709; *Maxwell v. Harper*, 51 Wash 351, 98 P 756. Relevant, too, is this statement from Wigmore on an analogous matter:

"But for *wills* a special consideration comes into play. Here it can hardly be doubted that the execution and especially the contents are impliedly desired by the client to be kept secret during his lifetime, and are accordingly a part of his confidential communication. It must be assumed that during the period the attorney ought not to be called upon to disclose even the fact of a will's execution, much less its tenor. But, on the other hand, this confidence is intended to be temporary only. That there may be such a qualification to the privilege is plain. That it appropriately explains the client's relation with an attorney drafting a will seems almost equally clear.

> "It follows, therefore, that after the *testator's death* the attorney is at liberty to disclose all that affects the execution and tenor of the will." VIII Wigmore on Evidence 610, § 2314.

The reason for such a rule is sound, because it is at the time of death that the document is to become effective, and it is presumed that the client wanted every material fact revealed that might aid in giving it effect. See also *Booher v. Brown,* 173 Or 464, 473, 146 P2d 71.

After careful consideration of all the arguments presented on this appeal, and in the light of the record, we are convinced that the able and experienced trial judge was correct in his conclusions.

The decree is affirmed.